Commonwealth *v.* Ross, Appellant.

Argued March 13, 1961. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

H. *David Rothman*, with him *Louis I. Schwartz*, for appellant.

*William Claney Smith*, Assistant District Attorney, with him *George H. Ross*, Assistant District Attorney, and *Edward C. Boyle*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, April 17, 1961:

Charles Ross, James Houlahan and Leo Chester[1] were indicted by the grand jury of Allegheny County for the murder of Harold Walker. Ross, tried before Judge J. FRANK GRAFF and a jury, was convicted of first degree murder with the penalty fixed at life imprisonment. Motions for a new trial and in arrest of judgment were denied by the court below and judgment of sentence imposed. From that judgment this appeal was taken.

Midmorning on January 24, 1959, Harold Walker was found dead lying in bed in his room at 1104 Sheffield Street, Pittsburgh. The cause of death was shock following contusions of his head, neck, face, back and chest together with multiple fractures of the ribs, injuries which the Commonwealth established were "caused by repeated blows upon the various parts of Walker's body."

---

[1] After separate jury trials, Houlahan was convicted of voluntary manslaughter and Chester of first degree murder with the penalty fixed at life imprisonment.

At approximately 7:30 p.m. on January 23, 1959, the evening which preceded Walker's death, Alfred Tschudi, a fellow-boarder of Walker, observed Ross and another man on the stairway steps in Walker's boarding house and one of the men stated they were going to see a party named Stiles. Upon being informed no such person lived in that house, Ross and his companion left the premises. Tschudi then also left the house and returned approximately 25 minutes later. Upon Tschudi's return, he noticed Ross' companion at Walker's bedroom door placing a handkerchief on his face and Ross at the door to the bathroom in the upper hall. Tschudi went to his own room and, while there, heard things being thrown about in Walker's apartment. Tschudi directed the attention of Mrs. Kramer, the housekeeper on the premises, to this disturbance. Mrs. Kramer went to Walker's room and, as she pushed open the door she was pulled into the room. Tschudi then saw Ross coming from Walker's kitchen; upon Ross observing him, Ross chased him, threatening to shoot him, and then left the premises.[2]

Mrs. Kramer testified that, in the early evening of January 23rd, she saw Houlahan at the foot of the hall stairway and two other men on the stairway and noticed that Ross departed at the same time as Tschudi. Later in the evening, having been alerted by Tschudi, she went to Walker's room and, as she pushed open the door, Houlahan pulled her into the room and threw her on Walker's bed. The only persons then in the bedroom were Walker, Houlahan and Mrs. Kramer. Walker was bound hands and feet and lying flat on the bed. Houlahan left the room and, "immediately" thereafter, Walker told her "[t]hey tried to kill me" and "[t]hey wanted more money". A doctor was summoned

---

[2] Ross claims Tschudi's testimony in this respect conflicted with his testimony given at the coroner's inquest.

and gave Walker medical attention. Walker refused the doctor's suggestion that he be hospitalized. Mrs. Kramer stated that "Everything [in the bedroom] was disrupted and all the drawers and things were emptied on the bed. The same way, everything in the kitchen torn up."

After the alleged assault, a neighbor of Walker stayed with him until approximately 2 a.m. No one else saw Walker until Mrs. Kramer found him dead in his bed approximately eight and one-half hours later.

Nine days after Walker's death, Ross was apprehended at the home of a Mr. and Mrs. Robert Hoffman, 4626 Kincaid Street, Pittsburgh, the arrest taking place at two o'clock in the afternoon. Five and one-half hours later, while in police custody, Ross signed a written confession acknowledging his complicity in the assault upon Walker.

The Commonwealth's theory is that Walker, in some manner involved in the numbers racket, was known, at least to Ross, to have large sums of money, either on his person or in his living quarters, and that Ross, Houlahan and Chester went to Walker's home to rob him. According to Ross' confession, some money was actually taken from Walker's pocket.

Ross assigns various reasons why his conviction should be set aside: (1) that the confession was obtained by duress and coercion and before he had been given a preliminary hearing; (2) that his failure to complain of the manner in which the confession had been obtained did not give rise to an inference that the confession was voluntarily given; (3) that, inasmuch as the confession should not have been received in evidence, it was error to permit the reception of evidence of Ross' subsequent conduct; (4) that the Commonwealth at the time the confession was received in evidence had not proven the corpus delicti; (5) that the trial court magnified the Commonwealth's case and

minimized Ross' case; (6) that Walker's statements to Mrs. Kramer and certain photographs were erroneously received in evidence and (7) that the prosecuting attorney in his closing argument made highly improper and prejudicial remarks.

In *Rogers v. Richmond*, 365 U. S. 534, the United States Supreme Court stated: "Our decisions under [the Fourteenth] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. [citing cases]". Accordingly, if a confession is "found to be the product of constitutionally impermissible methods in . . . [its] inducement", the reception into evidence of such confession offends the due process clause of the Fourteenth Amendment.

With this principle in mind, we examine the factual background upon which Ross presently claims that his confession was the product of duress and coercion and, therefore, erroneously admitted in evidence.

At the time of Ross' arrest he was suffering from a toothache for which he had been taking medication. Ross testified[3] that he informed Captain Flynn, one of the arresting officers, of his toothache and Captain

---

[3] Ross did not take the stand at the trial. However, he did testify at a hearing before the court, in the absence of the jury, held for the purpose of preliminarily determining the voluntary nature of the confession.

Flynn instructed the other officers to take Ross to a dentist. Ross then stated: "I thanked Captain Flynn but told him that I could tell him nothing because of it. Captain Flynn became angry and he rescinded the order to take me to the dentist." According to Ross, several times he renewed his request to be taken to a dentist but received no response and it was not until the next morning, after the confession, that he was taken to a dentist who then removed two badly decayed teeth.[4] Ross also stated that an officer named Nestor told him that the Hoffmans—in whose home Ross was arrested—were in a police station and would be held as material witnesses unless Ross confessed and that, likewise, Ross' niece would be arrested for having an abortion. On cross-examination, Ross admitted that it was he who suggested to Captain Flynn that he would tell the police exactly what happened if the Hoffmans were not arrested.

Leonard Monti of the homicide squad testified that Ross, when arrested, had toothache medicine in his room which he was allowed to take with him, that Ross did complain of a toothache, that he did not ask Captain Flynn to be taken to a dentist but he was told that, after the questioning, he would be taken to a dentist to which Ross replied: "Oh, I have to cooperate to get my teeth pulled", a remark which made Captain Flynn angry. Before the confession was taken Monti tried to reach Dr. Corsello, a dentist, to treat Ross but was unable to locate him. The next morning Monti took Ross to that dentist.

Several incidents should be noted. After Ross' visit to the dentist on the day following the confession, Ross' confession was read in the presence of both Ross and

---

[4] The dentist testified at the trial that the teeth which he extracted were badly decayed and that, in his opinion, such teeth were productive of pain.

his codefendant, Houlahan. At that time and, in fact, up until the time of trial Ross made no complaint that the confession had been involuntarily obtained. Furthermore, two days after signing the confession, Ross took the police officers over the route he and his two companions traveled en route to the Walker home on the night of the assault.

Ross claimed at trial and now claims that his confession was obtained by impermissible methods, i.e., that he was induced to make the confession by reason of the pain arising from his teeth and the threats of the police to arrest Hoffmans as material witnesses and his niece for an abortion.[5] At trial, upon the request of Ross' counsel, the court, outside the presence of the jury, held a hearing at which both Monti and Ross testified; after such hearing, the court decided that the question of the voluntary nature of the confession was one of fact to be determined, under appropriate instructions, by the jury. The court in its instructions to the jury carefully and adequately outlined for the jury Ross' contention that the confession was impermissibly obtained. Implicit in the verdict of the jury is a finding that the confession was voluntarily given.

We have carefully scrutinized this record, particularly to determine whether in passing upon the voluntary nature of Ross' confession both the trial court and the jury, under proper and adequate instructions, correctly applied standards permissive under the due process clause of the Fourteenth Amendment. We are fully satisfied that the attention of the trial court was focused "for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear [Ross']

---

[5] In *Rogers v. Richmond*, supra, the court did not pass upon the question "whether the circumstances of the interrogation and the manner in which it was pressed barred admissibility of the confessions as a matter of federal law".

will to resist and bring about confessions not freely self-determined . . ." On the state of this record both the trial court and the jury acted with propriety in finding that Ross' confession was not obtained through duress or coercion and such confession was properly received in evidence and considered in determining Ross' guilt. There is no merit in this contention.

Ross' next objection is to the failure of the trial court to charge: "If you find that [Ross'] signed statement was made to the police while [Ross] was in their custody and before he had been given any kind of preliminary hearing for the purpose of advising him of the charges against him and of his right to refuse to give testimony which might incriminate him, then you must disregard [Ross'] statement." This instruction would be tantamount to a statement that a confession obtained prior to a preliminary hearing is inadmissible. That is not the law in this Commonwealth. In *Commonwealth v. Agoston*, 364 Pa. 464, 479, 480, 72 A. 2d 575, cert. den. 340 U. S. 844, we said: "A confession may be secured after a hearing as well as before a hearing. If the means employed are proper, a confession is testimonially *worthy;* if the means employed are improper, a confession is testimonially *worthless.* A confession may be secured from a prisoner by unlawful methods one hour after his arrest and he may be given a hearing one hour after that, but the promptness of the hearing would not make his confession admissible. On the other hand, a defendant may not be given a hearing for ten days after his arrest, yet during that period he might voluntarily confess his guilt without any questions whatsoever. *The delay in giving him a hearing would not make his confession inadmissible.*" (Emphasis supplied.) That Ross *knew* and had been informed of the fact that he was being charged with the murder of Walker and that he *knew* that he had the right to refuse to make any statement prior to

the time he made his written confession is clear beyond any doubt upon this record. In this respect his constitutional rights were fully protected. *Turner v. Commonwealth of Pennsylvania,* 338 U. S. 62, relied upon by Ross, is presently inapplicable.

Ross next urges that the trial court should not have permitted the Commonwealth to show Ross' conduct subsequent to making the confession, i.e., Ross' failure, when the confession was read in Houlahan's presence, to repudiate the confession or make complaint of the means employed to induce the confession and Ross' reenactment for the police of the route taken by himself and his two companions en route to the Walker home on the night of the crime. It is Ross' position that, while he made only one written confession, his subsequent conduct, which was interpreted by the Commonwealth as incriminating and in the nature of an admission or confession, was the "fruit of the . . . [confession]." (*United States v. Bayer,* 331 U. S. 532, 540). Therefore, Ross argues, since his written confession was obtained by impermissible means, his subsequent conduct, subject to interpretation as incriminating, likewise should be inadmissible in evidence. Ross' subsequent conduct corroborated both the voluntary nature of the confession and its trustworthiness. The propriety of the admission into the record of such testimony is self-evident and the trial court very properly permitted the reception of such testimony.

Ross next contends that the Commonwealth failed to establish the corpus delicti and, therefore, the confession should not have been received in evidence. The rule which governs this situation is set forth in *Commonwealth v. Turza,* 340 Pa. 128, 133, 134, 16 A. 2d 401: ". . . an extrajudicial admission or confession of one accused of crime cannot be received in evidence unless and until the corpus delicti of the crime has first

been established by independent proof, and that failure to comply with this prerequisite will exclude the admission or confession. . . ." However this rule does not require "that the Commonwealth must preliminarily and independently establish *all* the elements of the charge, i.e., (1) the occurrence of an injury or loss—in homicide, a person deceased, (2) somebody's criminality as the source of the injury or loss—in homicide that the death was caused by a beating, gunshot or other circumstances indicating a felonious act, and (3) the accused's identity as the responsible party or one of the responsible parties:" *Commonwealth v. Turza,* supra, p. 134. (Emphasis supplied.) In *Commonwealth v. Homeyer,* 373 Pa. 150, 156, 157, 94 A. 2d 743, we said: "The Commonwealth, . . . in order to establish the corpus delicti, must prove (1) that the alleged victim is dead, and (2) that the death occurred as a result of a felonious act. The corpus delicti, like other facts, may be shown by circumstantial evidence; it is sufficient if these circumstances are consistent with crime even though they are also consistent with suicide or accident; . . ." See also: *Commonwealth v. Kravitz,* 400 Pa. 198, 209-211, 161 A. 2d 861. Before the Commonwealth may introduce a confession into evidence it must first establish, either by direct or circumstantial evidence, that the person for whose death the prosecution is instituted is actually dead and that such death took place "under circumstances which indicate criminal means". In this case, the Commonwealth fully and completely satisfied this rule; it proved that Walker was dead and his death resulted from shock which arose from beatings which inflicted multiple injuries on his body, that, from the condition of Walker's living quarters and the res gestae statements of Walker, a robbery had been, at least, attempted and that the death arose from criminal means. At the time Ross' confession was offered and received the corpus delicti

had been adequately established. There is no merit in this contention.

The trial court stated to the jury that the evidence of the Commonwealth, if believed by the jury, was sufficient to convict Ross even without his confession. Ross now argues this statement of the trial court, considered in conjunction with the detailed recital of the Commonwealth's testimony contained in the court's charge, overemphasized the Commonwealth's case and, in effect, withdrew the issue of the voluntary nature of the confession from consideration by the jury. A reading of the court's charge in its entirety together with the context in which the court made the attacked statement to the jury completely shatters this argument. A trial court must neither magnify the evidence on one side nor belittle it on the other: *Commonwealth v. Watts*, 358 Pa. 92, 97, 56 A. 2d 81. However, the manner in which the trial court in its instructions recalls the testimony to the jury must depend upon the facts and circumstances of each case. The instant facts and circumstances fully justified the manner in which the trial court dealt with the testimony and we are convinced that the instructions were fairly given to the jury and in a manner fair to both the Commonwealth and the defendant. *Commonwealth v. Westley*, 300 Pa. 16, 20, 150 A. 94, is inapposite.

Mrs. Kramer testified that "immediately" after the alleged assault Walker told her that "[t]hey tried to kill me" and "[t]hey wanted more money". Ross contends these statements were inadmissible on the authority of *Commonwealth v. Fugmann*, 330 Pa. 4, 198 A. 99. Ross' attack upon the admissibility of the statements is not upon the ground that they were not part of the res gestae so far as spontaneity and the time element are concerned but rather upon the ground that they were conjectural in nature and statements of conclusions. In *Fugmann*, immediately after the explo-

sion of a cigar box bomb, deceased stated to his wife "Fugmann done this"; from the time of receipt of the bomb through the mail until the attempt to open the box which contained the bomb and caused its explosion no one, except the deceased's son, was in the room and, obviously, the accusation of Fugmann was simply an expression of an opinion which did not arise from any factual observation and to which the deceased could not have testified had he lived. On the other hand, the statements of Walker were made immediately after Ross and his companions had left the room and were expressions of what Walker had observed of the actions of his assailants and had Walker lived he could have so testified. *Fugmann* clearly does not control this situation. Walker's statements made "immediately" after the assault were patently admissible.

Photographs of the deceased lying on his bed depicting the scene in the bedroom when the body was discovered were admitted in evidence; their reception is now assigned as error. The court en banc's opinion well covered this contention: "It is next contended that the Court erred in admitting photographs taken of the deceased lying in bed the morning after the assault, and shortly after his death was discovered. In the first place the photographs of the deceased were not inflammatory. . . . It was testified that the deceased was suffering from tuberculosis, as well as having a heart condition, and that there was some evidence of syphilis. The question then arose for the jury's determination as to what was the cause of the death. Dr. Helmbold, a pathologist of great experience, stated that in his opinion death resulted because of shock from the severe beating administered. We believe that the photographs were helpful to the defendant upon the issue of the cause of death. When objected to the jury was instructed as follows: 'The Court: Overrule the objection with this admonition to the jury, that you must not al-

low these photographs of the body to prejudice you or inflame you in any way. They are only offered for the purpose of showing where this bed was in the room, and the Commonwealth, according to the opening of the District Attorney, is going to show that at least this deceased was thrown there, and I don't think they are inflammatory, nothing to inflame you, but if they should in any way inflame you, you must be very careful not to allow anything of that character to arise in your minds.'" It is interesting to note that, although objection was made to the photographs taken in the bedroom showing deceased on the bed, no objection was made to two photographs of deceased in the morgue. In *Commonwealth v. Novak*, 395 Pa. 199, 212, 150 A. 2d 102, we recently said: "The law is likewise well settled that in the trial of criminal cases photographs of the victim and of the scenes of the crime are admissible to aid the jury in their understanding of the alleged crime, the kind of crime it was, exactly what caused the victim's death and what, if any, connection defendant had with it; however, they are not admissible for the purpose of exciting or inflaming the emotions of the members of the jury. The admission of photographs is largely within the discretion of the trial Court and will not be reversed except for a flagrant abuse of discretion: [citing cases]." We find no abuse of discretion on the part of the trial court in admitting these photographs into evidence.

After the prosecuting attorney completed his closing argument to the jury, Ross' counsel moved for the withdrawal of a juror on the ground that the prosecuting attorney had referred "to the failure to deny the confession" and that this remark constituted a direct reference to the failure of the defendant to take the stand. The court did not recall the statement and the exact remarks of the prosecuting attorney are not of record. *Commonwealth v. Bolish*, 381 Pa. 500, 522, 113

A. 2d 464, controls this situation: "We have recently decided this very question, adversely to the defendant, in Commonwealth v. Kloiber, 378 Pa. 412, 106 A. 2d 820. We there reiterated—citing many cases in support—that the Court and the district attorney could properly say that the evidence of the Commonwealth was uncontradicted and undenied, but neither the Court nor the district attorney could adversely refer to defendant's failure to take the witness stand or draw an unfavorable inference from his failure to testify." See also: *Commonwealth v. Morrison,* 180 Pa. Superior Ct. 121, 129, 118 A. 2d 258. *After* the prosecuting attorney is alleged to have made this remark and during the charge of the court, the court stated: ". . . the defendant didn't take the stand. Neither the Court nor the District Attorney, under the law, has any right to comment upon this adversely to the jury. But it is my duty to tell you that it must not be considered as evidence against him. It is one of his constitutional rights. He doesn't have to take the stand if he doesn't want to, and it must not be considered as evidence against him. When he enters a plea of not guilty, that means he says that he didn't have anything to do with this. So you are not to consider that as evidence against him". We are satisfied from the record that the jury clearly understood that the defendant's failure to take the stand should not militate against him and that the remarks of the prosecuting attorney in nowise infringed upon Ross' constitutional privilege.

We have carefully examined this entire record; from such examination we are of the opinion that the court committed no trial errors, that Ross received a fair and impartial trial throughout which his rights, assured both by the Federal and State Constitutions, were fully protected and that his conviction was fully justified under the law and the evidence.

Judgment of sentence affirmed.