607 A.2d 779

**COMMONWEALTH of Pennsylvania**

v.

**Clive Antony ULEN, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 22, 1991.

Filed April 30, 1992.

504

506

Allen C. Welch, Lemoyne, for appellant.

William T. Tully, Asst. Dist. Atty., Harrisburg, for Com.

Before WIEAND, MONTEMURO and KELLY, JJ.

WIEAND, Judge:

Clive Antony Ulen, a lawyer in the City of Harrisburg, was tried by jury and was found guilty of possession of a controlled substance and criminal attempt to deliver a controlled substance.[1] Following the denial of post-trial motions, Ulen was sentenced to serve concurrent terms of imprisonment for not less than one (1) year nor more than four (4) years on his conviction for attempting to deliver cocaine and for not less than six (6) months nor more than one (1) year on his conviction for possessing cocaine. On direct appeal from the judgment of sentence, Ulen asserts that insufficient evidence was presented at trial to sustain his convictions. He contends also that he is entitled to a new trial because: (1) the prosecuting attorney used the Commonwealth's peremptory challenges in a racially discriminatory manner by striking all African–Americans from the venire; (2) the trial court erred by permitting the Commonwealth to introduce tapes of electronically intercepted conversations as rebuttal evidence when the tapes had not been provided to the defense in pre-trial discovery as required by Pa.R.Crim.P. 305 B(1)(g); and (3) the trial

1. The Commonwealth withdrew an additional charge of criminal trespass, and the jury found appellant not guilty of having possession of drug paraphernalia.

court erred because it refused to declare mistrials when (a) Commonwealth witnesses violated the court's sequestration order, and (b) the prosecuting attorney, during his closing argument, made reference to appellant's failure to testify in his own defense. After careful review, we find no basis on which to grant a new trial; and, therefore, we affirm the judgment of sentence.

The factual scenario leading to appellant's arrest and the evidence introduced at his trial have been extensively reviewed in the post-trial opinion of the trial court as follows:

Officer Suzanne Sheehan was seated in her patrol car at the intersection of Calder and Third Street in Harrisburg shortly after 1:00 a.m. on Monday, August 28, 1989, when she observed two individuals emerge from behind the garage of the Yellow Cab Company and approach a door which she knew led to a restroom. The officer knew that the building was no longer occupied by Yellow Cab and that only vehicles were stored within. Sheehan left her vehicle and walked across the street to the offices of Yellow Cab and asked a dispatcher whether the bathroom was open for public use. The dispatcher responded in the negative.

She then radioed her position and awaited the arrival of two other officers, Garman and Snyder. Garman arrived in less than a minute and boosted Officer Sheehan up so that she could see through a window above the door. From this position, she was able to observe the defendant Ulen "kind of half sitting in the sink." While Sheehan was in this position, Officer Garman's flashlight bumped against the door, and the defendant Ulen said either "Someone's in here" or "Who's out there?" Sheehan jumped down, announced "Harrisburg Police" and asked that the door be opened. There was no immediate response. Instead, Sheehan heard some paper rustling and some water being turned on and off. She again announced "Harrisburg Police" and tried unsuccessfully to open the door. After the passage of one or two minutes, the door was opened, and the defendant Ulen stepped out.

When asked where the female was that was with him, Ulen responded, "What female?" Officer Garman located the female in the stall area of the bathroom and removed her.

A search of the bathroom disclosed a hypodermic syringe partially filled with a clear liquid in a hole in the wall adjacent to the stall. Ulen was observed sliding his left foot as if he were trying to hide something. In the area where he had been standing, Police found a rubber material packed with a white powder substance.

Aleta Bell, the female involved, testified that she had known the defendant Ulen for about five years. She admitted that she had a criminal record for prostitution and indeed had been working as a prostitute in the area in which she was arrested during August of 1989. During the early morning hours of August 28th, she had gone to Big Jay's Bar on Verbeke Street near Third Street where she met Ulen. She said that they walked up the street looking for a place "to get high." They went into the Yellow Cab bathroom where Ulen removed a white balloon from his pocket and prepared a cocaine shot.

Lieutenant Goshert, head of the city's vice control unit, testified as to the substance of an oral interview with the defendant following his arrest. Goshert said that Ulen told him that he and Ms. Bell, whom he had known for some time, met at Big Jay's and decided to walk to the Friendly Bar and that on route she said she had to go to the bathroom. Ulen admitted entering the bathroom with her and said he knew her to be a drug user, but denied that the cocaine or the syringe were his.

The first and only witness in chief called for the defense was James Henry, Sr., a longtime friend of the defendant. Ulen had come to Henry's home on the afternoon prior to his arrest, and the two decided to go out drinking to celebrate Henry's birthday. They began to drink at about 7:30 p.m. and traveled to various bars before ending up at Big Jay's. Earlier, Henry said that he had seen Aleta Bell outside of the Friendly Bar, and at

that time she had shown him a syringe and a balloon. Henry allowed as how he knew Bell to be a cocaine user and that she always carried a syringe.

During cross-examination of Henry, the following exchange occurred:

Q Have you discussed this case, what happened that night, with anyone else other than Mr. Berry (Ulen's attorney)?

A My mother.

Q You haven't discussed it with Mr. Ulen?

A No, sir.

Q Think for a moment. Have you discussed it with anybody else?

A (Witness shakes head from side to side.)

Q You didn't discuss it with anybody?

A I discussed it with my mother.

Q The people you discussed it with were Mr. Berry, your mother, and Aleta Bell?

A Yes.

(N.T. 204–206)

The defense then rested.

In rebuttal the Commonwealth called one Charlenee Bullock. She had been in Dauphin County Prison at the same time as Aleta Bell, but had been released on November 3, 1989. About a week later, at 1:30 in the morning, Bullock had occasion to meet James Henry outside of Charlie and Ernie's Bar. Henry said that somebody wanted to see her and then placed a telephone call from within the bar. Shortly thereafter, the defendant Ulen pulled up in his car and the three of them (Ulen, Henry and Bullock) went for a ride. Ulen wanted to know if Bullock had been in jail with Aleta Bell and whether or not she (Bullock) would be willing to testify in court. Ulen said, "I'll take care of you." Ulen said that he would "take the charge for the paraphernalia if Lele (Bell) takes the charge for the cocaine." Bullock was to testify that while in jail, Aleta told her that the cocaine

belonged to her and that the "works" (the syringe) belonged to Ulen. Bullock said that the truth of the matter was that Bell admitted possession of the syringe and that the cocaine had been provided by Ulen. While in the car, Bullock said that Ulen had provided her with money so that she could "cop" cocaine and that she immediately did so. She then returned to the car, and the three of them went to her house to use the drug. After she had been reincarcerated in Dauphin County Prison, she stated that she called Henry and was told that he was meeting Ulen and that he would bring some money out to the Dauphin County Prison. The money was to be in exchange for her testimony.

Following the testimony of Bullock, the Commonwealth offered to play a tape recording of a telephone conversation between Bullock and Henry. Defendant objected since the recording had not been made available during pre-trial discovery. The court then took a brief recess during which counsel for the defendant and counsel for the Commonwealth met in chambers to review the tape and the transcript. Defendant renewed his objection to its introduction; however, he did not request a continuance to further review the new evidence. The court overruled the objection, and the tape recording was played for the jury.

In surrebuttal, the defendant finally took the stand. Ulen admitted to having met with Charlenee Bullock and Henry and taking a drive in his car. He recalled asking Bullock if she and Bell were cell mates and whether Bell had made any statements about his case. Bullock responded by saying that Bell had said the syringe and the balloons were hers. Ulen then qualified that answer by quoting Bullock as saying Bell said that she brought half the cocaine and that Ulen brought the other half. Ulen said that Bullock agreed to testify on his behalf without compensation.

He was then asked whether his conversation with Bullock was limited to that single day in November and

responded that he recalled no other incidents in which he spoke with Charlenee Bullock. The Commonwealth then produced another tape recording and offered to cross-examine the witness with respect to it. Defense counsel objected on the basis of a violation of the discovery rules. The Court overruled the objection, and the tape was played to the jury. Having heard the tape recording, Ulen admitted that he "vaguely" remembered the conversation. At first he denied ever intending to give Bullock any money. On redirect examination, Ulen allowed that he had agreed to place some money "for cigarettes and things of that nature" in Bullock's commissary account, but never in exchange for perjured testimony. James Henry was also called in surrebuttal: He denied asking Charlenee Bullock to lie at Ulen's trial. Henry did admit discussing the case with her and did admit agreeing to "give her a couple dollars on the commissary" for some personal necessities.

 Appellant's post-trial motions contained only a "boiler-plate" challenge to the sufficiency of the evidence at his trial. This was inadequate to preserve for appellate review any specific deficiency in the Commonwealth's proof. See: *Commonwealth v. Holmes*, 315 Pa.Super. 256, 461 A.2d 1268 (1983). Our review of the record, moreover, discloses ample evidence to support the jury's verdict. The evidence, as accurately summarized by the trial court, was that appellant and Aleta Bell had gone into the Yellow Cab bathroom for the purpose of using cocaine. The cocaine which they were going to ingest had been supplied by appellant. This evidence was clearly sufficient to establish both appellant's possession of cocaine and his attempt to deliver it to another.

During voir dire, the prosecuting attorney exercised peremptory challenges to remove from the jury panel three African–Americans who were on the panel. At the conclusion of the jury selection process, defense counsel requested a sidebar conference and placed upon the record an objec-

tion to the prosecutor's striking all the blacks from the jury panel. In response to this objection, the following occurred:

MR. KLEINFELTER [Prosecuting Attorney]: I didn't realize that [the defendant] was black. He is light skinned. Well, he is not a hundred percent, but whatever. I have reasons for striking every juror.

THE COURT: I don't know that it's necessary to go that far but put it on the record.

MR. KLEINFELTER: If I may. If the challenge was to juror number 29, Lewis L. Butts, who does appear to me to be black, our records which we keep of prior juror service indicate that Mr. Butts was the foreman in a prior jury which recommended a not guilty verdict. For that reason, I struck Mr. Butts.

THE COURT: I don't see any others.

MR. KLEINFELTER: I believe juror number 153, Allene Stewart, is black. She gave an address at 38–F Hall Manor. I never picked jurors who live in Hall Manor because of the high incidence of crime in that housing project in Harrisburg.

Is there anybody else?

MR. BERRY [Defense Counsel]: Juror number 28.

MR. KLEINFELTER: Juror number—seating position 28, juror number 164, Ruth Via, is white.

Are you referring to Jennie M. Poole, who is in position of juror number 124?

MR. BERRY: Is that the black woman in the back?

MR. KLEINFELTER: Her slip, her jury slip indicates that she requested to be excused from jury duty because—and what I'm looking at is the form completed by the juror when they make application. She requested to be excused and she wrote in, seriously ill, husband.

If somebody is here and has not been excused, I find that those people think unfavorably toward the government for not excusing them and I don't put somebody into jury service what wants to be excused for that kind of a reason and for that reason, I struck her.

THE COURT: All right. Is that all?

MR. KLEINFELTER: Otherwise the jury is satisfactory?

MR. BERRY: Other than the fact that the three blacks were stricken, we would like the objection on the record.

THE COURT: It's on the record.

MR. KLEINFELTER: Also with respect to the last juror, we didn't even get to her, she wouldn't have been on this jury whether I struck her or not because we picked the first 12 and 2 alternates. She's number 14 from the Poole before we got to that last juror, Mrs. Poole.

THE COURT: Those not selected may return to the jury room. Thank you for coming down.

In order to establish a prima facie case that the prosecuting attorney exercised peremptory challenges in a racially discriminatory manner, the following must be shown:

> 1) the defendant's membership in a cognizable racial group; 2) the prosecutor's use of peremptory strikes to exclude members of that group; and 3) an inference arising from the totality of the circumstances that the prosecutor used the strikes to exclude venirepersons on account of race.

*Commonwealth v. Jackson,* 385 Pa.Super. 401, 412–413, 561 A.2d 335, 340 (1989), *affirmed on other grounds,* 526 Pa. 294, 585 A.2d 1001 (1991). See also: *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 197, 555 A.2d 846, 850 (1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990); *Commonwealth v. Stern,* 393 Pa.Super. 152, 155–156, 573 A.2d 1132, 1134 (1990).[2] Here, it is clear from the record that appellant is black and that the Commonwealth used its

---

**2.** We note that in *Powers v. Ohio,* 499 U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court held that a white criminal defendant had standing to challenge the exclusion of blacks from his jury. However, the *Powers* Court observed that shared racial identity between the defendant and excluded jurors may in some cases make it easier for a defendant to establish both a prima facie case and a conclusive showing of discrimination under *Batson. Id.* 499 at ——, 111 S.Ct. at 1373–1374, 113 L.Ed.2d at 429.

peremptory challenges to preclude any blacks from serving on appellant's jury. Therefore, appellant was able to demonstrate a prima facie case of discrimination in the selection of the jury. See: *Commonwealth v. Weaver*, 390 Pa.Super. 434, 440–445, 568 A.2d 1252, 1254–1257 (1989) (prosecutor's use of 5 of 8 peremptory challenges to remove all potential black jurors resulting in an all white jury established prima facie case of discrimination); *Commonwealth v. McCormick*, 359 Pa.Super. 461, 469, 519 A.2d 442, 446 (1986) (fact that all black veniremen were peremptorily stricken by Commonwealth raises inference that peremptory challenges were used to discriminate).

■ Once a defendant meets his burden of establishing a prima facie case of discrimination, "[t]he burden then shifts to the prosecution to give a neutral explanation for striking the potential jurors." *Commonwealth v. Dinwiddie*, 373 Pa.Super. 596, 601, 542 A.2d 102, 104 (1988), *affirmed*, 529 Pa. 66, 601 A.2d 1216 (1992). See: *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In meeting this burden, "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Batson v. Kentucky, supra* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. However, " 'the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race.' " *Commonwealth v. Jones*, 525 Pa. 323, 326, 580 A.2d 308, 310 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1009, 112 L.Ed.2d 1092 (1991), quoting *Batson v. Kentucky, supra* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. See also: *Commonwealth v. Hardcastle*, 519 Pa. 236, 243, 546 A.2d 1101, 1104 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). "In addition, it is insufficient for the prosecutor to merely state that his or her actions were done in good faith and no racial motive exists for striking members of defendant's race."

*Commonwealth v. Dinwiddie, supra* 373 Pa.Super. at 601, 542 A.2d at 104–105.

The trial court observed in its post-trial opinion that it found the prosecutor's reasons for striking the three black venirepersons sufficient to rebut appellant's assertion that his jury had been selected in a racially discriminatory manner. Appellant contends that the prosecutor's explanations for striking the three black prospective jurors were pretextual and intended to disguise his discriminatory motive. He argues, therefore, that the reasons were inadequate to rebut appellant's prima facie case of discrimination.

In *Commonwealth v. Lloyd*, 376 Pa.Super. 188, 545 A.2d 890 (1988), the Superior Court observed that "the primary responsibility for assessing the genuineness of the prosecutor's reasons is vested in the trial court...." *Id.*, 376 Pa.Superior Ct. at 198, 545 A.2d at 895. In this regard the *Lloyd* Court stated further:

> '[t]here are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual. See, e.g., *People v. Hall*, 35 Cal.3d 161, 197 (197 Cal.Rptr. 71, 75, 672 P.2d 854, 858 (1983) (en banc) (reasons proffered by prosecutor for peremptorily excusing blacks were equally applicable to whites not excused; held, defendant's prima facie showing not rebutted). If the court determines that the prosecution's presentation is inadequate to rebut the defendant's proof, the court should declare a mistrial and a new jury should be selected from a new panel.'

*Commonwealth v. Lloyd, supra* 376 Pa.Super. at 197–198, 545 A.2d at 895, quoting *McCray v. Abrams*, 750 F.2d 1113, 1132 (2d Cir.1984). Therefore,

‘ "[A] Finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court. Since the trial court's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. Thus, an appellate court will reverse a trial court's finding of no discrimination only if that finding is clearly erroneous." ’

*Commonwealth v. Woodall*, 397 Pa.Super. 96, 99, 579 A.2d 948, 950 (1990), quoting *Commonwealth v. Jackson*, 386 Pa.Super. 29, 52–53, 562 A.2d 338, 349–350 (1989) (en banc) (plurality opinion per Beck, J.) (citations omitted). See also: *Hernandez v. New York*, 500 U.S. ——, ——, 111 S.Ct. 1859, 1868–1871, 114 L.Ed.2d 395, 408–412 (1991) (plurality opinion per Kennedy, J.).

The trial court determined that there were race neutral, non-pretextual reasons, for excluding the several African–Americans from the jury. We are unable to conclude from the limited record forwarded to this Court for review that the trial court's determination was erroneous.

Appellant next argues that the trial court erred by permitting the Commonwealth to introduce, during rebuttal, tapes of electronically intercepted telephone conversations between rebuttal witness Charlenee Bullock and defense witness James Henry and between Bullock and appellant. Appellant contends that the Commonwealth violated Pa. R.Crim.P. 305 B(1)(g) by failing to disclose the existence of these tapes during pre-trial discovery, despite a specific discovery request for any such evidence. The Commonwealth contends, however, that the tapes were not material to the issue of appellant's guilt or innocence and suggests that it could not have anticipated the relevance of Charlenee Bullock and the tapes as rebuttal evidence, until after defense witness, James Henry, had testified unexpectedly on cross-examination that he had not discussed the case with anyone other than defense counsel and his mother.

Pa.R.Crim.P. 305 B provides in pertinent part as follows:

(1) **Mandatory:** In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

. . . .

(g) the transcripts and recordings of any electronic surveillance, and the authority by which the said transcripts and recordings were obtained.

Pa.R.Crim.P. 305 B(1)(g). "Under Pa.R.Crim.P. 305 B(1), the Commonwealth is required to disclose to defense counsel all items which have been requested by a defendant, provided that they are material to the case." *Commonwealth v. Hudgens*, 400 Pa.Super. 79, 96, 582 A.2d 1352, 1361 (1990). "Evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Commonwealth v. Redmond*, 395 Pa.Super. 286, 298, 577 A.2d 547, 553 (1990), *alloc. granted*, 526 Pa. 632, 584 A.2d 315 (1991), quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40, 57 (1987). See also: *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985); *Commonwealth v. Hudgens, supra* 400 Pa.Super. at 97, 582 A.2d at 1362. It has been observed that "[i]n some circumstances, evidence tending to impeach the credibility of a witness, if possessed by the Commonwealth, may be material and subject to discovery under Rule 305 B(1)." *Commonwealth v. Gelormo*, 327 Pa.Super. 219, 231, 475 A.2d 765, 771 (1984). See: *Commonwealth v. Jenkins*, 476 Pa. 467, 383 A.2d 195 (1978). See also: *Commonwealth v. Melendez*, 326 Pa.Super. 531, 544, 474 A.2d 617, 623 (1984).

In *Commonwealth v. Thiel*, 323 Pa.Super. 92, 470 A.2d
145 (1983), the Superior Court made the following observa-
tions:

It is true that we cannot expect the Commonwealth to
anticipate the materiality of all possible rebuttal evidence,
*Commonwealth v. Oliver*, 251 Pa.Super. 17, 379 A.2d 309
(1977), and we can imagine cases in which the materiality
of certain evidence in the Commonwealth's possession
might not become apparent until after trial has begun.
On the other hand, Rule 305 B(1) makes no distinction
between rebuttal evidence and evidence the Common-
wealth expects to use in its case-in-chief. In cases where
the prosecutor can reasonably predict possible defense
strategies and evidence, he must also be held to reason-
able anticipation of what evidence in his possession might
be material in rebuttal. See *Commonwealth v. Jenkins*,
476 Pa. 467, 383 A.2d 195 (1978); *Commonwealth v.
Jackson*, 457 Pa. 79, 319 A.2d 161 (1974).

. . . .

Discovery decisions predating the enactment of liberal-
ized Rule 305 recognize that the Commonwealth's failure
to disclose possible impeachment or rebuttal evidence
may highly prejudice the defendant's case and lead to
reversible error when the evidence is sprung on the
defendant unawares. *Commonwealth v. Jenkins, supra;
Commonwealth v. Jackson, supra.* Discovery of prose-
cution evidence therefore has not been limited to evidence
the Commonwealth expects to use in its case-in-chief.
*Id.* at 97–99, 470 A.2d at 148–149. "The purpose of the
discovery rules is to permit the parties in a criminal matter
to be prepared for trial. Trial by ambush is contrary to the
spirit and letter of those rules and cannot be condoned."
*Commonwealth v. Moose*, 529 Pa. 218, ——, 602 A.2d 1265,
1274 (1992).

After careful review, it seems clear to us that the
tapes withheld by the Commonwealth were material to the
issues being tried. We also conclude that the Common-

wealth's withholding of this information cannot be justified by its assertion that it was unaware of its value until after it had cross-examined defense witness James Henry. The major thrust of the Commonwealth's rebuttal evidence was that appellant and his friend Henry had offered Bullock money to give false testimony. Not only did this evidence impeach Henry's testimony regarding his discussions prior to trial, but it was relevant and admissible as tending to show appellant's consciousness of guilt. See: *Commonwealth v. Knapp*, 374 Pa.Super. 160, 165–166, 542 A.2d 546, 548–549 (1988); *Commonwealth v. Brooks*, 352 Pa.Super. 394, 405, 508 A.2d 316, 322 (1986). See generally: Packel and Poulin, Pennsylvania Evidence, Ch. IV, § 423 (1987).[3] Moreover, the prosecutor's cross-examination of James Henry makes it abundantly clear that the prosecutor was attempting to establish a situation in which the tapes would become material. Therefore, we are constrained to conclude that the Commonwealth did violate Rule 305 B(1)(g) by failing to disclose to the defense the existence of the tapes in response to a defense request therefor during pre-trial discovery.

■ "When a party has failed to comply with Rule 305, the trial court has broad discretion in choosing an appropriate remedy." *Commonwealth v. Palmer*, 319 Pa.Super. 56, 58, 465 A.2d 1050, 1052 (1983). See also: *Commonwealth v. Cannady*, 404 Pa.Super. 215, 221, 590 A.2d 356, 359 (1991); *Commonwealth v. Feflie*, 398 Pa.Super. 622, 635, 581 A.2d 636, 643 (1990). In this regard, Pa.R.Crim.P. 305 E states:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing

**3.** The trial court instructed the jury, however, that the tapes could be considered only for the purpose of assessing the credibility of defense witness James Henry's direct testimony and appellant's testimony on surrebuttal.

evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

In *Commonwealth v. Johnson,* 310 Pa.Super. 385, 456 A.2d 988 (1983), the Superior Court said:

Pa.R.Crim.P. 305 E gives the trial court broad discretion in formulating remedies for a failure to comply with discovery requirements. In many cases, ordering a continuance will be an adequate remedy. This will be so where the undisclosed statement or other evidence is admissible and the defendant's only prejudice is surprise. *E.g., Commonwealth v. Parente,* 294 Pa.Superior Ct. 446, 440 A.2d 549 (1982); *Commonwealth v. Bey,* 294 Pa.Superior Ct. 229, 439 A.2d 1175 (1982). Sometimes, however, the prejudice will go beyond surprise; if the prejudice is so great that the fairness of the trial has been affected, a new trial should be ordered. *Commonwealth v. Jenkins,* 476 Pa. 467, 383 A.2d 195 (1978).

*Id.* 310 Pa.Super. at 395, 456 A.2d at 993. "[I]n order to be awarded a new trial, [a defendant] must prove that the evidence was exculpatory and material to his case, and that the Commonwealth's failure to disclose the evidence was prejudicial." *Commonwealth v. Hudgens, supra* 400 Pa.Super. at 96, 582 A.2d at 1361. See also: *Commonwealth v. Murphy,* 493 Pa. 35, 45–46, 425 A.2d 352, 357 (1981); *Commonwealth v. Woodell,* 344 Pa.Super. 487, 491–492, 496 A.2d 1210, 1212–1213 (1985).

■ Our assessment of the prejudicial impact of the taped conversations is severely limited by the absence of either the tapes or the transcripts of the contents thereof. They simply are not a part of the record which has been certified to this Court on appeal. With respect to the first tape, the Bullock–Henry conversation, the trial court observed that "[i]n the recording Bullock talked with Henry about money to be paid to her and about getting 'high.'" With respect to the tape of the conversation between Bullock and appellant, the trial court said, "Bullock discusses with [appellant] the payment of money, but [appellant]

indicates that he would rather talk to her in person."
According to the trial court, in neither taped conversation
was there a direct reference to the payment of money in
exchange for perjured testimony. It was for this reason
that the trial court concluded, "the substance of the rebut-
tal testimony came in—without objection—through the
sworn testimony of Charlenee Bullock. The tapes, which
were objected to, essentially only serve to corroborate the
testimony of Bullock."

We are unable to discern from the record that there was
prejudice mandating that appellant be awarded a new trial.
Appellant has not challenged on appeal the admissibility of
the rebuttal testimony given by Charlenee Bullock, which
directly implicated Henry and him in a scheme to procure
perjured testimony. The tapes of the electronically inter-
cepted conversations between Bullock and Henry and Bull-
ock and appellant, if the trial court is correct, did no more
than corroborate oral testimony which Bullock gave in open
court. Although we do not condone the Commonwealth's
failure to provide these tapes to the defense prior to trial or
its apparent attempt to ambush the defense, appellant has
not demonstrated that the admission of the tapes into
evidence so prejudiced the defense as to undermine the
fairness of his trial and require that a new trial be granted.

 Prior to the start of trial, the trial court granted a
defense motion to have all Commonwealth witnesses se-
questered. The first witness to testify for the Common-
wealth was Officer Suzanne Sheehan of the Harrisburg
Police Department. The second Commonwealth witness
was Officer William Snyder. At the conclusion of Snyder's
direct examination, the trial court declared a brief recess.
When the trial resumed for the cross-examination of Officer
Snyder, the following occurred:

BY MR. BERRY [Defense Counsel]:

Q Mr. Snyder, you exited the stand during the recess,
you had a conversation with Officer Sheehan. Was that
conversation relevant to your testimony or to hers?

A Yes. She—she just told me what you were asking.

Q So you have been advised of the questions that I asked Officer Sheehan even though you were sequestered in this case?

A Yes.

No immediate objection was made to the violation of the sequestration order. After all of the testimony had been received and both sides had rested on the following day, however, defense counsel objected to the violation of the sequestration order on the previous day of trial. Counsel also requested that the trial court address the violation of the sequestration order in its charge to the jury. In response, the trial court instructed the jury as follows:

THE COURT: I do not know what is on the record about someone talking, but whatever is on the record, if that has any effect on what a witness testified to, take it into account. But there is no evidence as to—well, I do not recall.

One of the witnesses said he talked to one of the other witnesses. What he said precisely I do not know so I do not know how relevant it is. But if you think it is important, why, take it into account.

In concluding that the violation of the sequestration order did not entitle appellant to a new trial, the trial court observed that:

Officer Snyder had completed his entire direct examination without conferring with Officer Sheehan, and the record of the cross-examination of Officer Snyder is devoid of any suggestion that he attempted to change his direct testimony so as to conform in some way with what he might have learned during his conversation with Sheehan during the recess. Accordingly, it may be assumed that Snyder's discussion with Officer Sheehan was harmless.

We observe, in addition, that the trial court granted appellant's request for an instruction that the jury could consider the violation of the sequestration order. Under these circumstances, appellant is not entitled to a new trial because of the mid-trial conversation by the two witnesses. In

*Commonwealth v. Smith,* 464 Pa. 314, 320–321, 346 A.2d 757, 760 (1975), the Supreme Court said:

The selection of a remedy for the violation of a sequestration order is within the sound discretion of the trial court. See *Commonwealth v. Martin,* 440 Pa. 150, 153, 269 A.2d 722, 723 (1970); *Commonwealth v. Turner,* 389 Pa. 239, 264, 133 A.2d 187, 199 (1957). In exercising its discretion, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, and its probable impact on the outcome of the trial. We will disturb the trial court's exercise of its discretion only if there is no reasonable ground for the action taken.

See also: *Commonwealth v. Snowdy,* 412 Pa.Super. 493, ——, 603 A.2d 1044, 1049 (1992); *Commonwealth v. Mokluk,* 298 Pa.Super. 360, 363–364, 444 A.2d 1214, 1216 (1982). In the instant case, the trial court's response to the violation of the sequestration order was reasonable and did not constitute an abuse of discretion.

Finally, appellant complains of the following comments by the prosecutor in his closing argument:

Mr. Ulen testified concerning his relationship with Charlenee Bullock, and that's the extent of his testimony. What happened there on the steps of Big Jay's bar from the mouth of the only person other than Tony Ulen who was there? And that's Aleta Bell. What was said? What took place along the way up to the bathroom? What occurred in the bathroom? That part of the testimony is essentially unrebutted, members of the jury. It's essentially unrebutted.

Appellant asserts that these comments by the prosecuting attorney constituted an improper reference to his decision not to testify and violated his constitutional right against self-incrimination.

 "It is well settled that the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence at trial or instructions by the court that such is evidence of guilt." *Commonwealth v. Davis,*

452 Pa. 171, 174, 305 A.2d 715, 717 (1973) (citations omitted). See: *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). See also: *Commonwealth v. Henderson,* 456 Pa. 234, 317 A.2d 288 (1974); *Commonwealth v. Reichard,* 211 Pa.Super. 55, 233 A.2d 603 (1967). "This Court has long recognized the principle 'that the prosecutor's remarks to the jury should not contain any adverse reference to the failure of [an accused] to offer himself as a witness in the event that he does not testify on his own behalf.' " *Commonwealth v. Torres,* 329 Pa.Super. 58, 64, 477 A.2d 1350, 1353 (1984), quoting *Commonwealth v. Myers,* 131 Pa.Super. 258, 265, 200 A. 143, 146 (1938). This is so because " 'allowing the prosecution to comment on the accused's failure to testify [is], in effect, allowing the failure to take the witness stand to be used as evidence against him, which in the minds of the jurors would be indicative of guilt.' " *Commonwealth v. Torres, supra* 329 Pa.Super. at 65, 477 A.2d at 1353, quoting *Commonwealth v. Henderson, supra* 456 Pa. at 238, 317 A.2d at 291. However, "[s]uch comments are improper [only] if they unequivocally call attention to the defendant's failure to testify." *Commonwealth v. Kloch,* 230 Pa.Super. 563, 589, 327 A.2d 375, 389 (1974). Therefore, "while it is improper for a prosecuting attorney to refer to a defendant's failure to testify, it is not improper for the prosecutor to identify for the jury items of evidence which have been uncontradicted." *Commonwealth v. LaMassa,* 367 Pa.Super. 54, 57, 532 A.2d 450, 451 (1987). See also: *Commonwealth v. Jones,* 242 Pa.Super. 471, 476–477, 364 A.2d 368, 370–371 (1976); *Commonwealth v. Kloch, supra* 230 Pa.Super. at 588–590, 327 A.2d at 389–390. " 'To constitute error, the remark must go further, indicating a duty of the defendant to testify, and permitting an unfavorable inference to be drawn from his failure to do so.' " *Commonwealth v. Kloiber,* 378 Pa. 412, 419, 106 A.2d 820, 824 (1954), *cert. denied,* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954), quoting *Commonwealth v. Thomas,* 275 Pa. 137, 141, 118 A. 667, 668 (1922). " 'Reference to the failure of a defendant to testify on his own behalf, to constitute reversible

error, must call the jury's attention to the fact that the defendant has not testified and must reasonably lead to an inference that he would have taken the stand if not guilty.'" *Commonwealth v. Kloiber, supra* 378 Pa. at 420–421, 106 A.2d at 825, quoting *Commonwealth v. Holley*, 358 Pa. 296, 300–301, 56 A.2d 546, 548 (1948).

Even in situations where the prosecuting attorney has made improper reference to a defendant's failure to testify, the Supreme Court has held that the trial court's jury instructions may, in some instances, be sufficient to cure the error. See: *Commonwealth v. Maloney*, 469 Pa. 342, 365 A.2d 1237 (1976). See also: *Commonwealth v. Ross*, 403 Pa. 358, 371–372, 169 A.2d 780, 787 (1961), *cert. denied*, 368 U.S. 904, 82 S.Ct. 182, 7 L.Ed.2d 98 (1961); *Commonwealth v. Loar*, 264 Pa.Super. 398, 404–405, 399 A.2d 1110, 1113–1114 (1979). In this regard, the Supreme Court has stated:

> Initially, whether the harm can be removed by curative instructions will be within the sound discretion of the trial judge and his determination will be subject to appellate review. In making this decision, the following will be important considerations but not necessarily exclusive: (1) the nature of the reference, particularly, whether it was a specific comment on the accused's silence at trial or at the time of arrest or whether it was, as in *Commonwealth v. Ross*, supra, merely a reference to the fact that incriminating evidence of the Commonwealth was undenied or uncontradicted; and (2) whether the accused's silence was exploited by the district attorney.

*Commonwealth v. Maloney, supra* 469 Pa. at 349, 365 A.2d at 1241. See also: *Commonwealth v. Ashmore*, 266 Pa.Super. 181, 189, 403 A.2d 603, 607 (1979).

▮ In the instant case, while appellant did not testify during the defense case in chief, he did take the stand and testify in surrebuttal. Appellant's testimony on surrebuttal did not concern the events upon which the charged offenses were based. Rather, it was limited to refuting the Commonwealth's rebuttal evidence regarding the alleged attempt to suborn perjury. The Commonwealth suggests

that, by taking the stand during surrebuttal, appellant waived his Fifth Amendment right against self-incrimination. We do not agree.

In *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984), the Supreme Court observed that:

> when a defendant testifies as to a collateral matter, the prosecutor is not permitted to comment adversely upon his refusal to testify on the merits of the charge against him. The rationale for this rule is that such comment would run counter to the privilege against self-incrimination and the defendant's presumption of innocence.

*Id.* 502 Pa. at 498, 467 A.2d at 300 (citation omitted). This rule appears to have developed from the Supreme Court's earlier decision in *Commonwealth v. Camm*, 443 Pa. 253, 277 A.2d 325 (1971), *cert. denied*, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972). In *Camm*, the defendant had taken the stand for the limited purpose of contesting the voluntariness of his confession and had informed the trial court specifically that he was not waiving his Fifth Amendment rights. In considering whether the defendant had waived his privilege against self-incrimination, the Supreme Court reasoned:

> [I]f a defendant takes the stand and opens an area of inquiry, he cannot claim the privilege when, on cross-examination, he is interrogated in that particular area, and that wide latitude should be allowed in cross-examination.
>
> In the case at bar, since appellant's direct testimony was restricted to the general question of voluntariness of his confession, the waiver of his privilege was coextensive with the permissible scope of cross-examination relative to that subject; it was not a general waiver. *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *Calloway v. Wainwright*, 409 F.2d 59 (5th Cir. 1969).

*Commonwealth v. Camm, supra* 443 Pa. at 264, 277 A.2d at 331 (footnote omitted). In the instant case, therefore,

appellant did not waive entirely his Fifth Amendment privilege by taking the stand to refute the Commonwealth's rebuttal evidence. The waiver occurred only with respect to the area of inquiry opened by his surrebuttal testimony.

■ The emphasis of the prosecutor's remarks was that the testimony of Aleta Bell had been uncontradicted. However, the remarks also implied that appellant was the only other person who could have testified regarding the events leading up to his arrest. Such comments by a prosecutor were improper. They have been held to violate a defendant's Fifth Amendment right against self-incrimination. See, e.g.: *Commonwealth v. Davis, supra; Commonwealth v. Reichard, supra*. We conclude, therefore, that the prosecutor's remarks in this case regarding appellant's failure to testify were improper.

The trial court held that any error by the prosecuting attorney had been harmless.[4] It relied upon the Supreme Court's decision in *Commonwealth v. Camm, supra*. There, the prosecutor had argued to the jury as follows:

"But, there is the additional issue, of course the ultimate issue, of whether or not he did it and you heard him when he took the stand and you never once heard his attorney ask him whether he was responsible for the killing of George Kaffke. And you never once heard his attorney ask him what he was doing on that particular evening."

**4.** The trial court reasoned as follows:
Here, of course, the defendant made no claim that he was taking the witness stand for a limited purpose or that he was reserving his rights against self-incrimination. By the same token, the Commonwealth never attempted to cross-examine Ulen as to his version of the incident which gave rise to the charges. Thus, this case stands in sharp contrast to that of *CAMM* where the defendant both announced his exercise of the privilege prior to testifying and then was repeatedly required to assert the privilege during cross-examination. Similar to the facts in *Camm,* the prosecutor's comment was not extensive, no inference of guilt from silence was stressed to the jury, and there was no direct evidence that could have supported acquittal. Thus, error—if any there was—committed by the prosecutor was harmless "beyond a reasonable doubt." *Commonwealth v. Camm,* supra. See also, *Commonwealth v. Russell,* 459 Pa. 1, 326 A.2d 303 (1974); *Commonwealth v. Ashmore,* 266 Pa.Super. 181, 403 A.2d 603 (1979).

*Id.* 443 Pa. at 266, 277 A.2d at 332. While concluding that the prosecutor's remarks had improperly invited the jury to draw an adverse inference from the defendant's failure to testify regarding his guilt or innocence, the *Camm* Court held that the error was harmless. The Court reasoned as follows:

[A] new trial is not required if the error committed by the assistant district attorney was harmless "beyond a reasonable doubt". *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The United States Supreme Court has recognized this limitation on *Griffin [v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)] in *Anderson v. Nelson,* 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968), and *Fontaine v. California,* 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968). In the former case the court held that:

" * * * comment on a defendant's failure to testify cannot be labeled harmless error in a case where such a comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal."

In both *Anderson* and *Fontaine,* the court noted the insufficiencies of the state's case and the likelihood that without the adverse comments the jury would not have returned guilty verdicts.

The case before us stands in sharp contrast to *Anderson* and *Fontaine.* Here the comment was not extensive, no inference of guilt from silence was stressed to the jury, and there was no evidence that could have supported acquittal. The assistant district attorney's statement was lacking the vindictive qualities of those questioned in *Griffin, Anderson* and *Fontaine,* and must be viewed in light of the fact that here the defendant was in fact a witness, even though for a limited purpose.

*Id.* 443 Pa. at 268–269, 277 A.2d at 333.

We agree with the trial court's conclusion that the prosecutor's remarks in this case were harmless. They

were not extensive and did not overtly suggest that any inference of guilt be drawn. Additionally, the trial court instructed the jury that no adverse inference should be drawn based upon appellant's failure to testify during the defense case in chief. Moreover, the evidence of appellant's guilt was overwhelming. We are persuaded beyond any reasonable doubt, therefore, that the prosecutor's remarks did not contribute to the jury's verdict. See: *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). See also: *Commonwealth v. Camm, supra; Commonwealth v. Torres, supra* 329 Pa.Super. at 66, 477 A.2d at 1354.

Both the prosecuting attorney and defense counsel vigorously represented their clients, but an able and experienced trial judge was able to keep them within bounds on a level playing field.[5] The judgment of sentence, therefore, will be affirmed.

Affirmed.

---

5. Without raising a separate issue, appellant suggests in his brief that the trial court was unnecessarily critical of defense counsel during trial. Our review of the record discloses a total lack of merit in appellant's suggestion.