J-A10017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RICHARD KRISTA, | |
| Appellant | No. 174 WDA 2015 |

Appeal from the Judgment of Sentence July 29, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0007547-2012

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and SHOGAN, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 09, 2016**

Appellant, Richard Krista, appeals from the judgment of sentence of two consecutive terms of life imprisonment without the possibility of parole (LWOP), imposed following his conviction for two counts of first-degree murder.  Herein, Appellant argues that the Commonwealth's attorney engaged in prosecutorial misconduct, adversely referencing Appellant's decision not to testify at trial, which was not alleviated by the trial court's subsequent jury instruction.  Appellant also complains that the trial court erred when it did not allow defense counsel to pursue a specific line of questioning during the *voir dire* of potential jurors, and by dismissing a juror without creating an adequate record for the removal justification.  After careful review, we vacate the judgment of sentence and remand for a new trial.

Appellant's current conviction was the product of his third jury trial for the deaths of victims Cody Ruder and Joseph Sherrill. Appellant's previous two trials resulted in hung juries. An unorthodox summary of the facts leading to Appellant's conviction was provided by the trial court as follows:

**The Factual Dynamics: The Obvious**

On May 11, 2012, Ruder and … Sherrill were shot to death behind Building 20 in the Mon View Heights public housing complex in West Mifflin, Pennsylvania. Sherrill received 3 gunshots to the body: one to the back of the head and two to the right side of the neck. All three were from close range. Ruder was hit 4 times with bullets. One entered his body around his left shoulder and eventually fractured his spinal cord. This shot was from close range based upon the "stippling" found near the entrance wound. A second wound was near his jawline not far from his left ear. The 3rd bullet entered around his chin. The muzzle of the gun was maybe an inch away [from that wound]. A 4th bullet hit the left che[e]k area of his face. A bottle of Hennessey liquor remained grasped by Ruder as he laid [*sic*] there.

**The Night Before**

Ruder and Sherrill were killed on May 11, 2012. The evening before, [Appellant] was at Building 20. He was inside a residence with girlfriend, Lauren, and two others, Sheniya Smith and Alexis Burch. [Appellant] and Lauren were arguing. The topic - Ruder flirting with Lauren. Lauren did not like that attention from Ruder. She told [Appellant] that she wanted Ruder "handled" and "dealt with[."] [Appellant] said that "he'll take care of it" and the "next time I see him, it's over[."] A gun was observed inside a coat that [Appellant] was wearing. It was also revealed that [Appellant] said "if I have to use a gun, I will[."]

**The Prelude**

Not far from Building 20 is Whitaker Street. Marie Grayson lives there. She allowed Ruder to stay there and call her home his home. Around 4 p.m. on May 11th, people started to gather at the Grayson house. It was Marie's birthday. The front porch

was the epicenter of fun.  Ruder and Sherrill were there talking and laughing and otherwise enjoying the moment.  Alcoholic beverages were consumed.  After dark, sometime between 9 and 10 p.m., Ruder and Sherrill left the Grayson residence.  Ruder [was] carrying a bottle of Hennessey liquor. Maybe 5 minutes later, flashes of gun fire are seen.

### [Appellant] Returns

The evening of the murders, [Appellant] was back at Building 20.  Inside 20-E[] was Alexis Burch, her sister and Lauren, [Appellant]'s girlfriend. They were not the only one's [sic] there.  [Appellant] was there along with his little cousin.  They left out the back door and a few minutes later – maybe 1 to 3 minutes - shots r[a]ng out.

### The Babysitter & Screen Door

May 11th was Josh Smithwick's birthday.  Not any birthday, but his 21st birthday.  His plans included celebrating with family and friends.  He got to Jennifer Payne's home at 20-D Mon View Heights between 7-8 o'clock that evening.  He came with his fiancé – Ashley Fey.  The group's exit to their party destination was delayed.  They were waiting on a cousin to come babysit Payne's children.  The wait got interrupted by the sound of gunfire.  The gunshots came from behind Jennifer Payne's place.

Ms. Payne's 15 year old son had left her home a little bit before the shots were heard.  Sensing danger[,] she bolted out the front door.  Josh [was] right there with her.  She [was] standing on the front stoop.  The screen door did not work right.  The spring/air pump that allows the door to close gently was broken.  Instead, the door slam[med] shut.  The noise caused two light skinned black males to stop running and look where the noise came from.  In doing so, they look[ed] in Ms. Payne's direction.  They [were] face to face.  One has a white shirt on with something in his hand.  Josh sa[id] the thing in his hand is a gun.  The other had darker clothing on.

### Identification

Joshua Smithwick was about 5 years out of high school when he testified.  He played football at West Mifflin High School.  So[] did [Appellant].  They were teammates.  After police arrived at the scene on May 11th, they spoke with Smithwick.  He gave them the name of [Appellant].  A photo

array was later conducted.  [Appellant] was picked out as the man who had the gun in his hand.

Trial Court Opinion (TCO), 8/31/15, at 5-7.

Appellant was charged with two counts of criminal homicide, and his first trial commenced on October 2, 2013.  That trial ended on October 10, 2013, when the jury failed to reach a verdict, prompting the trial court to declare a mistrial.  Appellant's second trial began on January 13, 2014.  That jury was also unable to reach a verdict, causing the trial court to declare a mistrial on January 23, 2014.  Appellant's third trial, the focus of the instant appeal, began on May 28, 2014.  On June 5, 2014, the jury found Appellant guilty of two counts of first-degree murder.

On July 29, 2014, the trial court sentenced Appellant to consecutive terms of LWOP, and ordered restitution in the amount of $10,345.00.  Appellant timely filed post-sentence motions on August 4, 2014.  Subsequently, Appellant retained current counsel to handle his appeal.  On November 3, 2014, current counsel filed amended post-sentence motions.  Appellant's post-sentence motions were denied by operation of law on January 13, 2015.

Appellant filed a timely notice of appeal on January 27, 2015.  Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on March 10, 2015.  The trial court filed its initial Rule 1925(a) opinion on August 31, 2015, and an amended Rule 1925(a) opinion on September 8, 2015.  Appellant now presents the following questions for our review:

I. Whether the trial court's instruction to the jury that it should disregard the prosecutor's statement, "If Mr. Krista wants to take the stand and explain what happened, he can," cured the constitutional error created by the comment on [Appellant]'s right to remain silent?

II. Whether the trial court erred by refusing to permit adequate *voir dire* where trial counsel sought to question prospective jurors regarding bias if [Appellant] chose not to testify in his own behalf?

III. Whether the trial court erred in dismissing a juror during trial, lacking a sufficient record of cause to justify the removal?

Appellant's Brief, at 3.

Appellant's first claim concerns prosecutorial misconduct that violated Appellant's absolute right not to testify at his own trial. The contested statement occurred during Appellant's re-cross-examination of Detective Patrick Kinavey. Appellant's trial strategy focused, *inter alia*, on the dearth of physical evidence tying him to the murders of Ruder and Sherrill. Detective Kinavey essentially testified that one cause of the lack of physical evidence was the fact that Appellant was not apprehended in the immediate aftermath of the crime(s). Consequently, the recovery of certain physical evidence was practically impossible, such as the potential discovery of gun residue, or the victim's DNA, on the shooter's body. The delay also provided ample opportunity for the destroying or secreting of physical evidence.

With the assistance of defense counsel, Appellant had surrendered to police six days after the murders. However, at trial, defense counsel tried to elicit from Detective Kinavey that he (defense counsel) had begun negotiating Appellant's surrender several days earlier, by the third or fourth

- 5 -

day following the murders upon discovery of the warrant for Appellant's arrest. Counsel was pursuing that line of questioning to counteract any implication that Appellant had been actively evading police during those six days. It is in this context that the following exchange occurred during defense counsel's re-cross-examination of the detective:

Q. Detective Kinavey, this [the murders] happened on May 11, 2012; correct?

A. That is correct.

Q. And that was a Friday night; correct?

A. Yes.

Q. So one day later was Saturday. Sunday, two days. Monday, three days. Correct?

A. That is correct.

Q. You said it was six days. That's when you recall me having contacted Detective Foley and turned [Appellant] in upon learning that there was a warrant for him? You recall that; don't you?

[Prosecutor]: Objection, Your Honor. Mr. Wymard is testifying.

[Defense Counsel]: I'm asking.

[Prosecutor]: *If Mr. Krista wants to take the stand and explain what happened, he can.*

[Trial Court]: Gentlemen, approach.

[Whereupon, discussion at side bar as follows:]

[Defense Counsel]: With permission, I am objecting to his remark. I am objecting and moving for a mistrial.

[Trial Court]: Mr. Schupansky, that was an inappropriate remark to make. I don't know why you would broach the subject. You know that he has no burden.

- 6 -

I am granting a mistrial.

N.T., 5/28/14-6/5/14 (Vol. I), at 312-13 (emphasis added, emphasis in original omitted).

Immediately following this incident, which occurred very early in the afternoon, the jury was dismissed for the day. Subsequently, the trial court reconsidered its decision to grant a mistrial after extensive argument. *Id.* at 314-366. Instead, and over Appellant's objections, *id.* at 361, the trial court issued a lengthy curative instruction to the jury when it returned the following day, *id.* at 366-369.

Appellant contends that the prosecutor's comment directly referenced his silence at trial, thereby prejudicing him to a degree which no curative instruction could remedy.

> "It is well settled that the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence at trial or instructions by the court that such is evidence of guilt." *Commonwealth v. Davis*, 452 Pa. 171, 174, 305 A.2d 715, 717 (1973) (citations omitted). *See: Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *See also: Commonwealth v. Henderson*, 456 Pa. 234, 317 A.2d 288 (1974); *Commonwealth v. Reichard*, 211 Pa. Super. 55, 233 A.2d 603 (1967). "This Court has long recognized the principle 'that the prosecutor's remarks to the jury should not contain any adverse reference to the failure of [an accused] to offer himself as a witness in the event that he does not testify on his own behalf.'" *Commonwealth v. Torres*, 329 Pa. Super. 58, 64, 477 A.2d 1350, 1353 (1984), quoting *Commonwealth v. Myers*, 131 Pa.Super. 258, 265, 200 A. 143, 146 (1938). This is so because "'allowing the prosecution to comment on the accused's failure to testify [is], in effect, allowing the failure to take the witness stand to be used as evidence against him, which in the minds of the jurors would be indicative of guilt.'" *Commonwealth v. Torres*, *supra* 329

Pa.Super. at 65, 477 A.2d at 1353, quoting **Commonwealth v. Henderson**, **supra** 456 Pa. at 238, 317 A.2d at 291. However, "[s]uch comments are improper [only] if they unequivocally call attention to the defendant's failure to testify." **Commonwealth v. Kloch**, 230 Pa. Super. 563, 589, 327 A.2d 375, 389 (1974). Therefore, "while it is improper for a prosecuting attorney to refer to a defendant's failure to testify, it is not improper for the prosecutor to identify for the jury items of evidence which have been uncontradicted." **Commonwealth v. LaMassa**, 367 Pa. Super. 54, 57, 532 A.2d 450, 451 (1987). **See also: Commonwealth v. Jones**, 242 Pa. Super. 471, 476–477, 364 A.2d 368, 370–371 (1976); **Commonwealth v. Kloch**, **supra** 230 Pa.Super. at 588–590, 327 A.2d at 389–390. "'To constitute error, the remark must go further, indicating a duty of the defendant to testify, and permitting an unfavorable inference to be drawn from his failure to do so.'" **Commonwealth v. Kloiber**, 378 Pa. 412, 419, 106 A.2d 820, 824 (1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954), quoting **Commonwealth v. Thomas**, 275 Pa. 137, 141, 118 A. 667, 668 (1922). "'Reference to the failure of a defendant to testify on his own behalf, to constitute reversible error, must call the jury's attention to the fact that the defendant has not testified and must reasonably lead to an inference that he would have taken the stand if not guilty.'" **Commonwealth v. Kloiber**, **supra** 378 Pa. at 420–421, 106 A.2d at 825, quoting **Commonwealth v. Holley**, 358 Pa. 296, 300–301, 56 A.2d 546, 548 (1948).

Even in situations where the prosecuting attorney has made improper reference to a defendant's failure to testify, the Supreme Court has held that the trial court's jury instructions may, in some instances, be sufficient to cure the error. **See: Commonwealth v. Maloney**, 469 Pa. 342, 365 A.2d 1237 (1976). **See also: Commonwealth v. Ross**, 403 Pa. 358, 371–372, 169 A.2d 780, 787 (1961), *cert. denied*, 368 U.S. 904, 82 S.Ct. 182, 7 L.Ed.2d 98 (1961); **Commonwealth v. Loar**, 264 Pa. Super. 398, 404–405, 399 A.2d 1110, 1113–1114 (1979). In this regard, the Supreme Court has stated:

Initially, whether the harm can be removed by curative instructions will be within the sound discretion of the trial judge and his determination will be subject to appellate review. In making this decision, the following will be important considerations but not necessarily exclusive: (1)

> the nature of the reference, particularly, whether it was a specific comment on the accused's silence at trial or at the time of arrest or whether it was, as in ***Commonwealth v. Ross***, ***supra***, merely a reference to the fact that incriminating evidence of the Commonwealth was undenied or uncontradicted; and (2) whether the accused's silence was exploited by the district attorney.
>
> ***Commonwealth v. Maloney***, ***supra*** 469 Pa. at 349, 365 A.2d at 1241. ***See also: Commonwealth v. Ashmore***, 266 Pa. Super. 181, 189, 403 A.2d 603, 607 (1979).

***Commonwealth v. Ulen***, 607 A.2d 779, 790-91 (Pa. Super. 1992).

Initially, we note that the Commonwealth does not devote any portion of its argument to whether the prosecutor, in fact, commented on Appellant's silence at trial. The Commonwealth does dispute the intent behind the remark by arguing that the prosecutor did not mean to encourage the jury to draw an adverse inference from Appellant's failure to testify. Instead, the Commonwealth contends that the prosecutor misspoke in response to the "improper actions" of defense counsel during the questioning of Detective Kinavey. For this reason, and because of the trial court's curative instruction, the Commonwealth argues that the prosecutor's statement on Appellant's silence at trial was harmless error.

Thus, it is effectively conceded that the prosecutor improperly referenced Appellant's silence at trial. This dovetails with the trial court's conclusion that "the comment by the prosecutor was inappropriate and had the potential for prejudice." TCO, at 20. Indeed, the language used by the prosecutor is unambiguous in this regard. In a single sentence, the prosecutor spoke directly to Appellant's decision to testify and the potential

of such testimony to resolve the timeline of events leading to Appellant's surrender to authorities. Thus, the comment "unequivocally call[ed] attention to the [Appellant]'s failure to testify[.]" **Kloch**, 327 A.2d at 389.

To further limit the scope of our inquiry, we note that Appellant does not challenge the content of the trial court's curative instruction, but rather its efficacy in curing the prejudicial effect resulting from the Commonwealth's constitutionally impermissible remark. Put simply, Appellant contends that no instruction was capable of curing or substantially diminishing the prejudicial effect of the prosecutor's comment.

Thus, our inquiry is limited to whether the prejudice resulting from the prosecutor's comment on Appellant's silence at trial was so grave as to require a new trial despite a curative instruction, or whether it was harmless beyond a reasonable doubt. As our Supreme Court advised in **Maloney**, this requires consideration of: 1) the nature of the comment itself, and 2) whether the Appellant's silence was exploited by the Commonwealth. This Court elaborated further in **Commonwealth v. Marsh**, 566 A.2d 296 (Pa. Super. 1989), establishing the following four-factor test:

> The courts of this Commonwealth use a four-factor test to determine whether cautionary instructions can cure [otherwise reversible] error: "1) the nature of the reference to the defendant's silence; 2) how it was elicited; 3) whether the district attorney exploited it; and 4) the promptness and adequacy of the cautionary instruction."

**Id.** at 300 (quoting **Commonwealth v. Gbur**, 474 A.2d 1151, 1154 (Pa. Super. 1984)).

- 10 -

In **Ross**, the prosecutor made a statement to the effect that there had been a "failure to deny the [defendant's] confession." **Ross**, 169 A.2d at 787. Upon objection by the defense, the trial court in **Ross** quickly advised the jury that it could not draw any adverse inferences from the defendant's failure to testify. Nevertheless, the **Ross** court noted that the statement was not grave error, or perhaps not error at all, because "the district attorney could properly say that the evidence of the Commonwealth was uncontradicted and undenied[.]" **Id.** (quoting from **Commonwealth v. Bolish**, 113 A.2d 464, (Pa. 1955)).

In **Commonwealth v. Anderjack**, 413 A.2d 693 (Pa. Super. 1979), a police officer who had interviewed the defendant immediately following his arrest was asked by defense counsel if he told "[the defendant] any information relating to the nature of the incident?" **Id.** at 697. The officer responded as follows: "Yes, we did. We explained what we had on the case to him and advised him of his rights and gave him a waiver of rights which he refused to sign." **Id.** The defendant moved for a mistrial on the basis that the officer had referenced his silence by referring to the defendant's failure to sign the waiver. The trial court denied the motion for mistrial and promptly issued a curative instruction.

In assessing "the degree of prejudice," the **Anderjack** court found the reference to the defendant's silence was "an implicit rather than explicit statement[,]" and that "the jury had previously heard testimony that [the] appellant was not always silent." **Id.** at 699. Furthermore, the reference to

- 11 -

the defendant's silence was not made or solicited by the prosecutor. As the

**Anderjack** court noted:

> From a defendant's point of view, the prejudice may be the same no matter how it is provoked, whether intentionally by the district attorney or as in this case, recklessly by defense counsel. Nevertheless, how the reference to the defendant's silence is elicited may be an important fact in a close case, for if elicited by the district attorney, this court may reverse not only because of the prejudice but also in order to express our disapproval of the district attorney's misconduct. Indeed, in **Commonwealth v. Singletary**, [387 A.2d 656 (Pa. 1978)], the reference to the defendant's silence was by the district attorney, who should have known better than to make such a statement. Here, however, there is no evidence of misconduct, either on the part of the district attorney, or on the part of the witness, who made only a single statement, added as an afterthought to complete the more responsive portion of his answer.

**Id.** (citation and footnote omitted).

Given the nature of the statement, the fact that it was not elicited by the prosecutor, and because a prompt and adequate jury instruction was given, the **Anderjack** Court denied the defendant's claim that he was entitled to a new trial based on the reference to his pre-trial silence.[1] **See also Gbur**, 474 A.2d at 1151 (holding mistrial not required where the reference to the defendant's silence was in a non-responsive statement by a witness, not purposefully elicited by the prosecutor, and addressed by the court with an immediate curative instruction).

_____

[1] The Court also noted that the prosecutor did not attempt to exploit the comment on the defendant's silence with any further questioning or during closing arguments.

In **Commonwealth v. Wright**, 961 A.2d 119 (Pa. 2008), the prosecutor told a jury during closing arguments that the defendant was one of the two "best witnesses" in the courtroom who "didn't testify in person." **Id.** at 141. While clearly a direct comment on the defendant's silence at trial, our Supreme Court found the violation of his Fifth Amendment right to be harmless error under the following circumstances. First, the evidence of guilt was great, such that the "trial was a river of evidence, and its flow was unaffected by this reference." **Id.** at 144. Indeed, the trial court in **Wright** had characterized the overwhelming nature of the evidence as "unprecedented," such that the defendant's guilt was proven "with absolute certainty." **Id.** For instance, the primary witness for the Commonwealth, the defendant's former paramour, directly observed the defendant shooting her husband in their home. The police arrived at the scene just as the defendant was leaving, and followed his vehicle in a low-speed chase. When the defendant arrived at another residence, he was in a standoff with police for 30 minutes. During negotiations with the police, the defendant said that he had just "'toasted a guy' and did not want to go to jail." **Id.** at 129. When the defendant ultimately surrendered, police discovered the still-loaded murder weapon on his person.

Second, the trial court immediately issued a curative instruction to the jury following the prosecutor's improper remark, and then later, "[d]uring jury instructions, the court charged the jury at length regarding [the defendant's] right to remain silent and specifically warned the jury against

drawing any adverse inferences from the prosecutor's comments. The court elicited responses from the jurors to ensure their acknowledgment and understanding[.]" *Id.* at 144. Because of these combined circumstances, the *Wright* court found no abuse of discretion in the trial court's refusal to grant a mistrial.

However, in the following line of cases, our appellate courts found the Commonwealth's claims of harmless error unavailing in response to references to defendants' silence. In *Commonwealth v. Clark*, 802 A.2d 658 (Pa. Super. 2002), the prosecutor was permitted, over persistent objections, to engage in multiple lines of questioning with the Commonwealth's witnesses concerning the defendant's pre-trial silence in response to *Miranda*[2] warnings given by the arresting police officers. The trial court was not oblivious to the defendant's Fifth Amendment rights; rather, the questioning was permitted under the auspices of allowing the Commonwealth to show that the defendant's silence was evidence of his concealing drugs in his mouth when arrested. However, the *Clark* court found that there were alternative means to demonstrate that alleged fact. Furthermore, there were multiple references to the defendant's silence, the

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that statements obtained from defendants during interrogation in police-dominated atmosphere, made without full warning of applicable constitutional rights, were inadmissible as having been obtained in violation of Fifth Amendment privilege against self-incrimination).

references were direct (the prosecutor deliberately discussed both *Miranda* and the right to remain silent with one witness), and the *Clark* court found that "credibility was paramount to a finding of guilt and it is impossible to measure the degree to which [the defendant]'s post-arrest silence might have impacted upon the jury's assessment in that regard." *Clark*, 802 A.2d at 662. Accordingly, the *Clark* court found that the impermissible statements on the defendant's pre-trial silence could not be deemed harmless.

In *Henderson*, the prosecutor stated during closing arguments: "You know this defendant is a vicious man. He sits here before you and he looks quite humble and looks quite harmless as defendants often do in a courtroom, because he is sitting here and hasn't said a word and is quiet[,]" prompting an immediate objection by the defense. *Henderson*, 317 A.2d at 290. The trial court then issued a comprehensive curative jury instruction. Nevertheless, our Supreme Court rejected the Commonwealth's harmless error claim, reasoning:

> Instantly, although the jury could have viewed the prosecutor's comment as merely reflecting on [the] appellant's conduct, it is more likely the statement was interpreted as an adverse comment on his failure to take the witness stand and testify in his own behalf. Moreover, viewed in the context of the entire statement, the jury could have interpreted the statement as imposing a duty on [the] appellant to testify. Likewise, although there was a great deal of evidence presented against the accused, … this evidence was rebutted to a certain extent. Mrs. Bighum was called by the appellant as an alibi witness, and she testified [the] appellant was at her home, in bed, watching television at the time of the robbery. Considering the adverse

statement in light of the alibi defense the jury could have reasonably concluded that had the alibi been true, the appellant would have taken the witness stand to fortify the testimony of his witness. Given the fact [the] appellant did not testify, the jury could have believed that not only was the alibi testimony untrue, but that [the] appellant was admitting his guilt by not testifying. Thus, it was reasonably possible that in light of the comment, the jury could have surmised [the] appellant's failure to testify was an admission of guilt. Thus, the exercise of a constitutional right could have been damaging evidence against the appellant. … Lastly, the Commonwealth argues the judge's charge to the jury cured any harmful effect of the district attorney's comment. Although, we recognize the trial judge may have done all he could under the circumstances, his corrective charge only would have vindicated the adverse effect of the summation with respect to [the] appellant's duty to take the stand. The judge's charge did not cure the adverse inference the jury could have drawn on the issue of guilt or admission of guilt.

*Id.* at 292.

Finally, in **Commonwealth v. Reichard**, 233 A.2d 603 (Pa. Super. 1967), the prosecutor questioned the jury, in closing, as follows: "I ask you one thing, did you hear one word of denial?" **Id.** at 604. The **Reichard** court held that this error was not rendered harmless by the subsequently issued curative instruction. Reichard was convicted of burglary and related offenses. Although the court's summary of the evidence was not particularly detailed, it did note the stolen goods were never discovered in the possession of Reichard or his co-defendant. Reichard offered two alibi witnesses in his defense. The **Reichard** court concluded: "In this particular case, it is clear that the prosecutor's statement could have contributed to the jury's ultimate determination of guilt. The error, therefore, was not curable and a reversal is required." **Id.** at 606.

Considering the first two **Marsh** factors and the above case law, the prosecutor's impermissible statement in this case bears little resemblance to those that made merely indirect references to a defendant's silence. Here, the prosecutor essentially challenged Appellant to take the stand to explain why he was not apprehended promptly after the murder, or why he took so long to turn himself in. This directly implicated the issue of Appellant's flight from justice, and "while evidence of flight alone is not sufficient to convict one of a crime, such evidence is relevant and admissible to establish an inference of guilt." **Commonwealth v. Gorby**, 588 A.2d 902, 909 (Pa. 1991). Thus, the prosecutor's statement may have suggested to the jury that Appellant shouldered a burden to explain why the Commonwealth lacked physical evidence that was only discoverable in the immediate aftermath of these murders. The prosecutor's comment does not at all resemble the statement at issue in **Ross**. There, the defendant had previously confessed and, as such, the comment that the confession had not been denied—while a vague reference to the defendant's in-court silence— was more directly highlighting the Commonwealth's permissibly admitted evidence of guilt.

Moreover, the prosecutor's statement in this matter regarded Appellant's in-court silence, rather than pre-trial silence, such as in **Anderjack** or **Clark**. The Fifth Amendment protection against self-incrimination is most potent with respect to silence at trial, and is effectively less potent with respect to a defendant's silence at earlier stages of the

criminal process. *See generally*, *Commonwealth v. Molina*, 33 A.3d 51, 56-67 (Pa. Super. 2011) (*en banc*) (discussing the permissible uses of a defendant's silence at various pre-trial stages as affirmative evidence of guilt or for impeachment purposes); *compare Commonwealth v. Cox*, 983 A.2d 666, 688 (Pa. 2009) (noting only one exception to the prohibition on a prosecutor's referencing of a defendant's failure to testify at trial, that "an otherwise inappropriate remark does not run afoul of *Griffin* if it constitutes fair response to arguments raised by the defense").

The prosecutor's statement in this case bears greatest resemblance to the prosecutor's impermissible statement in *Reichard*, although it is noted that that case involved a prosecutor's statement during closing arguments, whereas the statement in this case arose mid-trial during a debate over an objection, but still within earshot of the jury. Moreover, in the instant matter, the prosecutor himself made the impermissible reference, unlike in *Anderjack* and *Gbur*, where the statement was an unsolicited response from a witness. Thus, we find that the first two *Marsh* factors weigh strongly against a finding of harmless error in this case.

The next *Marsh* factor concerns whether the prosecutor "exploited" Appellant's failure to testify. The fact that this was a direct reference to Appellant's silence at trial—effectively a challenge to have Appellant explain the timeline of events following the murders and leading up to his surrender to authorities—does suggest that the prosecutor exploited Appellant's silence. Moreover, this was Appellant's third trial, and in both previous

instances, Appellant declined to take the stand in his own defense. Indeed, as is addressed later in this decision, defense counsel even sought to ask potential jurors specific questions regarding Appellant's decision not to testify at trial during *voir dire*. Thus, it is virtually beyond any question that the Commonwealth knew that Appellant did not intend to take the stand at this trial, and that the defense had made exceptional efforts to limit any prejudice and/or bias resulting from that decision. Such circumstances can be read to suggest that the prosecutor's comment was particularly exploitative of his prior knowledge that Appellant would not testify. Moreover, the statement was not "fair response" to any misconduct on defense counsel's part. There was no reason to bring up Appellant's decision not to testify merely because defense counsel's question(s) were objectionable.

On the other hand, this was a singular incident; there were no subsequent attempts by the prosecutor to exploit Appellant's silence. Furthermore, the comment did arise in a discussion with the judge and opposing counsel, not during a direct address to the jury, such as during opening or closing arguments. Nevertheless, we conclude that the third **Marsh** factor also weighs slightly against finding harmless error in this case, primarily because the prosecutor knew, or clearly should have known, that Appellant had no intention of testifying.

The final **Marsh** factor concerns the promptness and adequacy of the cautionary instruction. Appellant contends that no instruction was adequate

to cure the resulting prejudice from the prosecutor's comment. The trial court's instruction was certainly comprehensive. The jury was informed of Appellant's absolute right not to testify, his right to remain silent, and that the jury was not permitted to draw any adverse inference from his failure to testify or his failure to offer a defense. N.T., 5/28/14-6/5/14 (Vol. I), at 366. The court reminded the jury of its duty to follow the court's instructions, and went further to garner the jury's acknowledgment and understanding of those instructions. *Id.* at 367. In this regard, the trial court asked the jurors to "raise [their] right hand[s] to show [their] acknowledgment that [they] heard, understand, and will follow the instruction that [Appellant] need not make any defense in this trial should he choose[.]" *Id.* Each of the jurors, and the alternate jurors, complied. *Id.* at 367-68.

The trial court then instructed the jurors as follows:

> What I want further, I want you to disregard the following. The following statement by [the prosecutor] that [Appellant] was on the run. Disregard that. And, secondly, the statement that [Appellant] could take the stand to explain. That's what I am having you swear to, that he doesn't have any duty to do that.

> Further, there was a statement by [defense counsel] that he had made arrangements to turn his client in during the six-day window between the night of the shooting and the time of the arrest. I want you to disregard those three statements, the two by [the prosecutor] and the statement by [defense counsel]. I want to go back as though they had never occurred and we will start over again. Okay? I know it's kind of an odd challenge but can you do that? If you can do that, please raise your right hand.
> **[Whereupon, jury complies]**

*Id.* at 368.

However, while comprehensive in content, the instruction was not promptly given. Following the prosecutor's comment, the trial court dismissed the jury at 12:39 p.m. *Id.* at 313. The jury instruction began at 10:54 a.m. the following day. *Id.* at 366. This substantial delay must weigh strongly in our assessment of the adequacy of the instruction.

Whether the instruction was adequate to cure the prejudice is naturally a product of all of the aforementioned *Marsh* factors. Certainly, a comprehensive and prompt instruction in response to a *Ross*-like reference to a defendant's silence is adequate to cure such prejudice. However, not even the best possible instruction was adequate to cure the prejudice resulting from the statement in *Henderson*. Here, we have a statement that went well beyond the borderline-permissible statement at-issue in *Ross*, yet it also does not appear to be as calculated to affect the jury as was the statement in *Henderson*. Nevertheless, this was not a case of overwhelming evidence. While the circumstantial evidence in this case was not trivial, there were no eyewitnesses to the shooting itself, and no physical evidence tying Appellant to the crime. Moreover, this was Appellant's third trial for the same offense, with both previous trials resulting in hung juries. In such circumstances, it is more probable that the prosecutor's comment had a significant impact on the jury than if the evidence had been overwhelming, and even more probable given that the curative instruction was not promptly given. Indeed, the prosecutor's comment was so facially

improper that the instruction itself may have added to the resulting prejudice by bringing it to the attention of jurors who may have not heard it when uttered.  Thus, we cannot say with any confidence, as our Supreme Court did in **Wright**, that the "trial was a river of evidence, and its flow was unaffected by this reference."  **Wright**, 961 A.2d at 144.  Here, due to the prosecutor's constitutionally impermissible comment, a case based solely on circumstantial evidence, which had twice previously resulted in hung juries, came to a grinding halt for nearly 24 hours as the trial court struggled with how to preserve the fairness of Appellant's trial.

The Commonwealth contends that the prosecutor's statement was "not so much directed at [A]ppellant's failure to take the stand as it was an attempt to stop defense counsel's improper actions."  Commonwealth's Brief, at 22.  Indeed, the court ultimately instructed the jury to disregard defense counsel's comment regarding an arrangement with police to have Appellant surrender. N.T., 5/28/14-6/5/14 (Vol. I), at 368.  The Commonwealth likens this situation to that which occurred in **Commonwealth v. Wesley**, 753 A.2d 204 (Pa. 2000).

In that case, the defendant was found guilty of raping, sodomizing, and killing the victim, and his guilt was supported by DNA evidence. Moreover, security videos showed the defendant using the victim's debit card to withdraw funds from the victim's bank account on fifteen different occasions in the 24 hours following the crime, and the defendant's

fingerprints were found on a bank deposit envelop and one of the ATM machines.

At the close of the defense's case, wherein he had chosen not to take the stand, the defendant attempted to address the court and the jury, ostensibly because he was "frustrated with his counsel for failing to call certain witnesses[.]" *Id.* at 209. In response, the prosecutor said: "I would like the jury shown out. I will not have him speak if he is not going to testify." *Id.* After a "brief recess, the trial court instructed the jury that the Commonwealth's statements were not evidence and they could not consider them in reaching their verdict. Defense counsel did not object to the instruction." *Id.* Wesley appealed on the basis that "the cautionary instruction was inadequate and could not cure the prejudice caused by the allegedly improper comments." *Id.*

The *Wesley* court held:

Assuming that Wesley has not waived this issue because his counsel failed to preserve it with a timely objection, there remains no constitutional violation. Clearly, it was not the intention of the Commonwealth to remark on Wesley's decision whether to testify. Taken in context of the entire dialogue, it is more likely than not that the assistant district attorney was reacting to Wesley's impromptu interjection in an attempt to gain control over the courtroom to give his closing argument. Furthermore, we are not convinced that the comments in question were so significant as to have any measurable influence on the jury's deliberation. As we have noted earlier, the jury had sufficient evidence to find Wesley guilty beyond a reasonable doubt of first-degree murder. Even if the comments had some prejudicial effect, the cautionary instruction supplied by the trial court cured any potential harm to Wesley.

*Id.* at 209-10 (citation omitted).

Here, the prosecutor had already objected to defense counsel's question, and set forth the basis for his objection, before he made the impermissible comment. N.T., 5/28/14-6/5/14 (Vol. I), at 312. It was also immediately apparent to the trial court that the content of the statement was, on its face, an unambiguously impermissible comment on Appellant's absolute right not to testify, not something that was directly related to defense counsel's impermissible questioning. In *Wesley*, the prosecutor's comment was an immediate response to the defendant's impermissible statement. Here, the disputed comment followed the prosecutor's proper objection, and was therefore not a spontaneous reaction to defense counsel's actions.

*Wesley* is, therefore, clearly inapposite. Indeed, in that case, the prosecutor did not 'challenge' the defendant to testify. Rather, he stated, accurately, that the defendant should not be addressing the jury because he elected not to take the stand. And while there is some superficial similarity to the instant case, in the sense that the prosecutor in *Wesley* was reacting to the defendant's impromptu and impermissible outburst, while here the prosecutor was reacting to defense counsel's improper questioning (albeit with added delay), the statements uttered are not remotely comparable.

Furthermore, the evidence in *Wesley* was clearly more compelling than the evidence here. Moreover, the trial court in *Wesley* issued a curative instruction after a brief recess, whereas here, the jury was left to

ponder the prosecutor's comment for almost 24 hours before being advised to ignore it.

We also find the Commonwealth's comparison to *Commonwealth v. Ogrod*, 839 A.2d 294 (Pa. 2003), unconvincing.  In that case, the prosecutor commented that there had been no denial by the defendant of the crimes charged, in circumstances where Ogrod had previously confessed to police.  Relying on *Ross*, the *Ogrod* court stated that it was "reluctant to conclude that comments of this type constitute reversible error[,]" especially where the trial court had promptly issued a curative instruction after a short recess.  *Ogrod*, 839 A.2d at 325.  Defense counsel in *Ogrod* never requested a mistrial, because he had made a tactical decision, with the defendant's consent, "that it was in [Ogrod]'s interests to have the present jury adjudicate his guilt or innocence." *Id.*  Thus, the Supreme Court concluded that, because Ogrod received "an appropriate curative instruction, no relief [was] due outside of an ineffective assistance of counsel claim." *Id.*

Here, Appellant made no prior confession, and the content of the impermissible statement is simply not comparable to the one made in *Ogrod* for the same reasons we find the contested statement in *Ross* is not comparable.  The *Ogrod* statement could be fairly read to reference the defendant's confession, not his choice to refrain from testifying at trial. Moreover, the defense in *Ogrod* chose not to ask for a mistrial for tactical

- 25 -

reasons. Here, the defense has vigorously contested the fairness of the trial based on the prosecutor's improper statement.

We conclude, based on the above analysis, that the prosecutor impermissibly commented on Appellant's decision not to testify, in violation of Appellant's Fifth Amendment rights, and that this misconduct was not rendered harmless by the circumstances under which it was made, or by the trial court's delayed curative instruction. Accordingly, we are compelled to vacate Appellant's judgment of sentence and remand this matter for a new trial.

Next, Appellant complains that the trial court abused its discretion by refusing to allow a specific question during *voir dire* regarding Appellant's decision not to testify. Appellant wished to ask potential jurors: "If the Court should instruct you that a defendant need not testify at trial, and that no inference of guilt can be drawn from the choice of the [d]efendant not to testify, can you follow that instruction and not hold it against the [d]efendant if he does not testify?" TCO, at 9. The Commonwealth and the trial court maintain that Appellant's proposed question was unwarranted because it was substantially similar to a question asked of the jurors on the standard juror questionnaire. TCO, at 10; Commonwealth's Brief, at 31-33.

> The singular purpose of *voir dire* examination is to secure a competent, fair, impartial and unprejudiced jury. In pursuit of that objective, the right of a litigant to inquire into bias or any other subject which bear on the impartiality of a prospective juror has been generally recognized. Nevertheless, the scope of *voir dire* examination rests in the sound discretion of the trial

judge and his decisions will not be reversed unless there is an abuse of that discretion.

**Commonwealth v. Futch**, 366 A.2d 246, 248 (Pa. 1976) (italics added).

The instruction contained in the standard questionnaire that was given to the potential jurors read as follows: "Would you have any problem following the court's instruction that the defendant in a criminal case does not have to take the stand or present evidence, and it cannot be held against the defendant if he or she elects to remain silent or present no evidence?" Pa.R.Crim.P. 632(H) (question 11).

We agree with the trial court and the Commonwealth that the proposed question is nearly indistinguishable from the one given to the potential jurors. Appellant argues, however, that "unlike the standard question, trial counsel sought to place a fine point on the potential prejudice by asking whether 'no inference of guilt [would] be drawn from the choice of [Appellant] not to testify.'" Appellant's Brief, at 43. Appellant asserts this claim by relying on the general, axiomatic proposition that counsel is entitled to some level of participation in *voir dire* in order to investigate possible biases in the potential juror, a proposition which appears undisputed. Appellant also cites **Commonwealth v. Glaspy**, 616 A.2d 1359 (Pa. 1992), and **Commonwealth v. Davis**, 422 A.2d 671 (Pa. Super. 1981), but provides very little comparative analysis.

In **Glaspy**,

[d]uring the empanelling of the jury, defense counsel moved for individual *voir dire* to be conducted for all the jurors to explore any racial prejudices that the jurors may harbor. Defense

- 27 -

counsel characterized this case as a "racially sensitive" case requiring heightened scrutiny of the jurors. The trial court denied the initial request for individual *voir dire*. During the questioning by the court, one prospective juror stated that he would not be able to render a fair verdict because of the race of the defendants. Defense counsel renewed the motion for individual *voir dire* and the trial judge again denied defense counsel's motion for individual *voir dire*.

***Glaspy***, 616 A.2d at 1360.

Our Supreme Court reversed, reasoning:

In ***Commonwealth v. Richardson***, 504 Pa. 358, 473 A.2d 1361 (1984), this Court reversed the Superior Court's order granting a new trial to a black defendant accused of raping a white victim and who was not allowed to question the jurors on potential racial bias. The majority of this Court stated that "[b]y posing such questions, however, the trial court would have risked creating racial issues in a case where such issues would not otherwise have existed." ***Id.*** at 364, 473 A.2d at 1364. In this case, a prospective juror admitted during group *voir dire* that he could not render a fair verdict due to racial considerations. At that point the racial issue existed, and it was necessary for the trial court to allow counsel to examine the remaining jurors individually to ascertain whether any juror harbored any racial prejudices or biases that would affect that juror's ability to render a fair verdict.

***Id.*** at 1362.

In ***Davis***, the defendant requested a *voir dire* question regarding whether the potential jurors (or their immediate family members) had ever been the victim of a crime. The trial court refused to pose the question and, as in ***Glaspy***, no comparable question had been asked during *voir dire*. The ***Davis*** Court reversed, concluding that "the proposed *void dire* question … was sufficient to alert the court to an important area of potential prejudice. Since the court refused to pose the question as drafted or to mold it into an

acceptably limited form, [the] appellant must receive a new trial." ***Davis***, 422 A.2d at 674. The Court had already recognized the potential for prejudice arising from victims serving on juries in ***Commonwealth v. Fulton***, 413 A.2d 742 (Pa. 1979).

In both ***Glaspy*** and ***Davis***, the topics of the proposed questions for *voir dire* were not similar to other questions asked during *voir dire*, as was the case here, where the issue of Appellant's silence was specifically addressed through the standard questionnaire. Furthermore, ***Glaspy*** is distinguishable in that the issue of racial bias arose due to the statement of a potential juror, whereas here, there were no statements by potential jurors regarding Appellant's silence at trial. Neither ***Glaspy*** nor ***Davis*** address the issue at hand, which concerns whether the proposed question was significantly better than the standard question so as to render the trial court's refusal to allow it an abuse of discretion.

Because we find that the proposed *voir dire* was substantially the same as that provided in the standard questionnaire, such that that potential jurors were adequately screened for prejudice concerning Appellant's silence at trial, we conclude that the trial court did not abuse its discretion in rejecting the proposed question.

Finally, Appellant claims the trial court erred when it dismissed a juror without a sufficient record of cause to justify the removal. The juror in question apparently dozed off during the testimony of the Commonwealth's firearms expert. N.T., 5/28/14-6/5/14 (Vol. II), at 654. Appellant argues

that there was insufficient cause to remove the juror because the juror only drifted off for a few moments during uncontested testimony, citing Pa.R.Crim.P. 645, *Bruckshaw v. Frankford Hosp. of City of Philadelphia*, 58 A.3d 102 (Pa. 2012), and *Commonwealth v. Saxton*, 353 A.2d 434 (Pa. 1976).

"The discharge of a juror is within the sound discretion of the trial court. Absent a palpable abuse of that discretion, the court's determination will not be reversed." *Commonwealth v. Jacobs*, 639 A.2d 786, 790 (Pa. 1994). Rule 645 governs the "[s]eating and [r]etention of [a]lternate [j]urors." Pa.R.Crim.P. 645. "Alternate jurors, in the order in which they are called, shall replace principal jurors who become unable or disqualified to perform their duties." Pa.R.Crim.P. 645(A).

In *Saxton*, our Supreme Court held that: "While the decision to remove a juror because of inability to perform the usual functions of a juror is within the sound discretion of the trial judge, the exercise of this judgment must be based upon a sufficient record of competent evidence to sustain removal." *Saxton*, 353 A.2d at 436; *see also Bruckshaw*, 58 A.3d at 106 (recognizing "established precedent that once a principal juror is seated and sworn, that juror cannot be removed without good cause on the record").

Appellant argues that *Saxton* is controlling and compels reversal. In that case, the trial court, acting *sua sponte*, called a conference in chambers with a juror. The court asked the juror if he was ill, noting: "I notice you have a great deal of trouble in keeping awake. You keep dozing off."

*Saxton*, 353 A.2d at 435. The juror responded that he was in pain from an accident. The juror denied falling asleep, and indicated that he was paying attention. The Court asked the juror if he was using "[a]ny pills or narcotics?" *Id.* The juror answered, "[n]o." *Id.* Nevertheless, the court excused the juror.

Subsequently:

> The judge then advanced his personal observations that Juror No. 6 was 'yawning,' 'slouching down in her seat,' and 'shielding her eyes from the light,' and at times 'appeared to be dozing.' In addition, the trial judge stated that he had asked a Dr. Polivoy to sit in the courtroom and observe Juror No. 6 and report to the court. Dr. Polivoy at no time was made available to defense counsel or the district attorney for cross-examination either on his credentials or what in fact he observed, or on his opinion given to the trial judge that Juror No. 6 should be removed. The final 'evidence' to support the removal of the juror was the trial judge's own opinion that after spending one week a month for eighteen months in 'Drug Court,' Juror No. 6 'displayed every indicia of being an addict'.

*Id.* at 435-36.

Our Supreme Court reversed, reasoning:

> Having reviewed this record, we are of the opinion that the trial judge abused his discretion in discharging Juror No. 6. There is no competent evidence in the record to support the conclusion that Juror No. 6 was unable to perform as a juror *because of drug use*. Juror No. 6 answered 'no' to all questions concerning possible drug abuse. All the other 'evidence' was conjecture concerning drugs. The conclusions attributed to Dr. Polivoy were not based upon any medical tests or examinations to determine drug use, but were based solely on the doctor's in-court observations conveyed privately to the trial judge.
>
> While the decision to remove a juror because of inability to perform the usual functions of a juror is within the sound

- 31 -

discretion of the trial judge, the exercise of this judgment must be based upon a sufficient record of competent evidence to sustain removal. We find nothing in this record to support removal of Juror No. 6.

*Id.* at 436 (emphasis added, footnote omitted).

We disagree with Appellant that *Saxton* compels reversal here. While Appellant claims the "the court had made more extensive observations to justify its dismissal of the juror" in *Saxton*, Appellant is comparing apples to oranges. In *Saxton*, the issue ostensibly justifying the removal of the juror was not the juror's falling asleep, but the suspicion that the juror was suffering from the effects of drug use/abuse. Thus, *Saxton* cannot reasonably be read to speak to whether a record is sufficient to justify removal of a juror for falling asleep. We also agree with the Commonwealth that the record is not insufficient here merely because the trial court did not ask the juror if he had fallen asleep. *See* Commonwealth's Brief, at 39 (opining that "a trial judge is certainly in the position to determine, without further inquiry, whether a particular juror has fallen asleep in his courtroom, and, therefore, despite [A]ppellant's contention to the contrary, no greater record [is necessary] than the one developed here.").

We emphasize that Appellant has not raised the claim of whether falling asleep for a brief period of time is sufficient cause for the removal of a juror (although he suggests it in his brief). Appellant's objections to removing the juror at trial were regarding: the fact that falling asleep was understandable in the circumstances, *see* N.T., 5/28/14-6/5/14 (Vol. II), at 672; that the juror was initially given a warning which had not subsequently

been violated, *id.* at 672-74; that whatever testimony the juror slept through was not pivotal, *id.* at 673; and the removal of the juror would have a chilling effect on the jury, *id.* at 674-75. To the extent that Appellant now attempts to claim that a juror's falling asleep during testimony does not constitute sufficient cause to remove that juror, we conclude any such claim has been waived. **See** Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

To the extent that Appellant argues that whatever testimony was missed by the juror was uncontested and not pivotal, we adamantly disagree. The testimony in question concerned physical evidence that the victim had been shot from close range.[3] Such evidence was relevant to the circumstances of the shooting itself, including permissible inferences regarding Appellant's degree of guilt.

Based on the above, we conclude that the record was adequate to justify the court's removal of the juror for falling asleep during the testimony of a witness for the Commonwealth. In any event, because we are already granting Appellant a new trial on his first claim, Appellant cannot obtain any greater relief.

---

[3] This was evidenced by "smoke, soot, and vaporous lead that is expelled from the firearm" and found on the victim's clothing, which typically only occurs when someone is shot from close range. **See** N.T., 5/28/14-6/5/14 (Vol. II), at 651.

Judgment of sentence *vacated*. Case *remanded* for a new trial. Jurisdiction *relinquished*.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/9/2016